Pages 1 - 66

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Maxine M. Chesney, Judge

```
TROY BACKUS, on behalf of     )
himself and all others        )
similarly situated,           )
                              )
          Plaintiff,          )
                              )
  VS.                         )     NO. C 15-01963 MMC
                              )
NESTLÉ USA, INC.,             )
                              )
          Defendant.          )
_____)
```

San Francisco, California
Friday, August 21, 2015

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff Troy Backus:
                    The Weston Firm
                    1405 Morena Boulevard, Suite 201
                    San Diego, CA  92110
                    (619) 798-2006
                    (480) 247-4553 (fax)
              **BY:  GREGORY S. WESTON**

For Defendant Nestlé USA, Inc.:
                    Mayer Brown LLP
                    350 South Grand Avenue, 25th Floor
                    Los Angeles, CA 90071-1503
                    (213) 229-9509
                    (213) 576-8122 (fax)
              **BY:  DALE J. GIALI**

Reported By:  Lydia Zinn, CSR No. 9223, FCRR, Official Reporter

1   **Friday - August 21, 2015**                **9:02 a.m.**

2                     **P R O C E E D I N G S**

3        **THE CLERK:**  Please be seated.  Calling Case Number

4   15-CV-1963, *Troy Backus versus Nestlé U.S.A. Inc*.  Counsel,

5   please step forward and state your appearances for the record.

6        **MR. WESTON:**  Gregory Weston, for plaintiff

7   Troy Backus.

8        **THE COURT:**  Thank you.

9        **MR. GIALI:**  Good morning, Your Honor.  Dale Giali, on

10   behalf of defendant Nestlé U.S.A.

11        **THE COURT:**  Thank you very much.

12     All right.  Counsel, we have quite a bit to discuss this

13   morning, as you might expect.  Let me just make a couple of

14   comments.  As you know, there are two motions on calendar.  One

15   is a motion to dismiss the First Amended Complaint, and the

16   other is a motion to strike.  The former is a dispositive

17   motion; the latter is not.

18     And even assuming just for the moment, without finding

19   that in any way -- but just assuming for our discussion that

20   all or part of this Complaint may go forward, I don't think the

21   best use of your time is with respect to the motion to strike.

22   I have a pretty good idea of what belongs in the Complaint, and

23   what doesn't.  And, depending on the outcome of the motion to

24   dismiss, I will rule on the motion to strike.  As I say, if we

25   have time left over, and you want to talk about it, you can;

1 but you've both set forth your positions pretty fully as to why

2 certain material is in there, and why it should or shouldn't

3 be.

4     Okay.  So going to the motion to dismiss, there are a

5 number of different claims.  And I want to make sure that I'm

6 clear on what's covered by the various claims, because there

7 was an assumption made by the defendant that didn't seem to be

8 disputed by yourself, Mr. Weston, but I just want to make sure.

9 All right?

10     You've got, in your first three claims, an unfair claim

11 under the UCL; an unlawful claim -- and you flipped them right

12 over, the next three -- but anyway, unfair, unlawful, and

13 implied warranty.  And then you go back to the UCL again with

14 unlawful, fraudulent.  Let's see.  UCL unlawful.  UCL

15 fraudulent.  UCL unfair.

16     Okay.  I understood that those latter three had to do with

17 the mislabeling claims.

18         **MR. WESTON:**  That is correct.

19         **THE COURT:**  And the former had to do, then, with

20 the -- just the inclusion -- the use of, in the product, and

21 the assertion that it's unsafe to include.  Is that fair, then?

22         **MR. WESTON:**  That's exactly right.

23         **THE COURT:**  Okay.  Just to make that clear, because

24 in originally looking at the Complaint, I wasn't positive, but

25 I know you added the first three by way of amendment.

1      Okay.  Then we have some additional false advertising, the

2  Consumer Legal Remedies Act, and the express warranty; all

3  those dealing with labeling.

4      Let me just give you a little bit of a preview of my

5  thoughts.  And you can, you know, use your energy, so to speak,

6  on what you feel it's most useful.

7      I think the defendant makes a pretty good argument

8  regarding preëmption on the labeling claims.  We do have a

9  reported case that says the statement, "No trans fat" on the

10  front of the box, let's say, just to make it easy, as opposed

11  to in the special section on the nutrients.  So on the front of

12  the product, I'll say, or the front label -- that that is not

13  the same as "zero trans fat."

14      All right.  We have an unreported case that says zero

15  trans fat is okay.

16      We have, I believe, Judge Alsup of this Court saying zero

17  trans fat is okay.  I've got to get all of my colleagues

18  straight here, because they all fall into different categories

19  along the way.  And then you throw in a few District Judges

20  from other Districts, as well.

21      I'm generally persuaded by the reasoning that if the

22  Government makes you lie, in effect, on a box on the side, that

23  unless you want to totally muzzle the manufacturer and not

24  allow them to say anything on the front that might have to do

25  with that subject, they're required to be consistent on the

1   front.  And then there you go.

2       I have no idea why the Government says that you have to

3   put "zero percent" if it's less than the half a gram of trans

4   fat, as he opposed to:  If you want to, you can.  But anyway,

5   you have to.  By making that them do that, they're in a real

6   bind.

7       So we might come back to that if you like, Mr. Weston, but

8   I'm reasonably persuaded in that regard.  I'd have to hear

9   something very, very, you know, new, if you will, before I'd be

10  likely to change that state of mind.

11      And before I say anything else -- well, I had a pen.  Now

12  I've got the top of it.  Well, okay.  Thank you very much.

13  I've got the top of a pen.  I don't know what the rest of it

14  ended up doing.

15      Okay.  Keeping going, I think the harder claims are the

16  "use" claims.  And we do have a changing landscape here,

17  because of the FDA's determination that trans fats are not

18  Generally Recognized as Safe.  So I do want to take that up;

19  and then the various defenses that have been raised in

20  connection with those claims; and then go back to the labeling.

21  And anything else you want after that, if you thought of

22  something new.

23      For starters, just to get a couple of things out of the

24  way, we've got a lot of defenses that were raised by

25  Mr. Giali's client, Nestlé.  And so we've got save harbor,

1 primary jurisdiction, standing, class-action allegations,

2 statute of limitations; a lot of different things.

3     The save harbor -- I don't think, Mr. Giali -- is

4 particularly persuasive here, because we don't have any express

5 approval of the use that is being challenged here.

6     The class allegations, to the extent the issue only

7 effects the class, I think, is likely premature at this point,

8 and would wait a class-certification motion, assuming the

9 plaintiff is still standing when we get through with all of

10 this.

11     The standing question -- on this, I wanted to go back to

12 Mr. Weston for a moment.  It looked like there were two

13 different kinds of harm alleged here.  And the standing issue

14 may differ in that regard, so I want to get that clear.   One

15 loss that's being claimed by the plaintiff, as I understand it,

16 is all or part of the purchase price of the item -- okay -- on

17 the idea --

18     And for now, we're focusing on the first three claims.

19     -- on the idea that he didn't get a product that complied

20 with the warranty of merchantability; it was sold unlawfully;

21 it is an adulterated, unsafe product; and that's unlawful, so

22 it's unfair.  Okay.

23     That sounded just -- so, Mr. Giali, you can be kind of

24 forming up over on your side -- sounded like standing, to me.

25     The other loss or harm that seems to be alleged here,

1  although not really wrapped up in the prayer so much, was a

2  personal-injury claim.  So is Mr. Backus claiming personal

3  injury by reason of having consumed a PHO-containing product?

4        And just for the court reporter, the parties are using an

5  acronym -- "PHO" -- for "partially hydrogenated oil."  And it

6  probably is going to save us some time in this hearing if we

7  use that.

8        So okay.  You've got PHO.  All right.

9        Is the plaintiff claiming damages for personal injury?

10        **MR. WESTON:**  He is stating, for standing purposes,

11  that he has been physically injured.  And, in fact, I'd say

12  there are actually two types of physical injury.  There's one

13  that he has already suffered, because his body has been damaged

14  by the incorporation of PHO into his cells, which causes organ

15  dysfunction and cholesterol dysregulation.  And that's --

16  that's something that is suffered by everyone who's ever

17  consumed trans fat in the quantities Nestlé uses in

18  Coffee-Mate.

19        The second is an increased risk of death by a heart

20  disease, diabetes, and so forth.

21        **THE COURT:**  Okay, but those are the -- I understand

22  immediate injury, and risk of future injury; but why does he

23  need that if he's got the monetary standing?

24        **MR. WESTON:**  He doesn't.  I've only done that as an

25  abundance of caution.  For the fraud claims, he only has

1   economic harm.  And for the "use" claims, he has economic harm,

2   which is the one we seek to address through the class action.

3   And we when we've settled these trans-fat cases, we've had --

4   we've carved out personal injury.  So it's only to note that we

5   have additional standing, on top of the normal economic one.

6           **THE COURT:**  Well, yeah.  You know, I spent a lot of

7   time -- because you folks spent a lot of time -- talking about

8   physical injury and risk of harm for purposes of standing.

9   And, my goodness, Judge Henderson spent pages talking about

10  injury and risk of harm.  And you could say a lot of different

11  things about that; but if it's not necessary, I don't know that

12  it's the best use of our time, unless Mr. Giali is in a

13  position to convince me that if you pay money for something

14  that is illegally sold, that that is not standing.  Okay?

15      So we'll go back to whether it is illegal; what the status

16  is, given this three-year window to continue to sell that the

17  FDA has provided; and how that fits into the whole legal

18  framework, which seems to be more abrupt in its comments about

19  what one can do.

20      Okay.  But I just want to get that standing, you know, a

21  little bit out of the way, because I mightn't then spend a

22  great deal of time, if any, discussing the personal-injury

23  aspect of it, as long as there's no claim for loss based on it.

24  If there were, then the defendant has exposure, and then I'm

25  going to have to rule on that.  So let me get clear.  Is your

1  client claiming any kind of recompense based on personal

2  injury?

3          **MR. WESTON:**  No, not for his physical injury.

4          **THE COURT:**  Or risk?

5          **MR. WESTON:**  That's an interesting question, but no.

6          **THE COURT:**  No.  Okay.

7          **MR. WESTON:**  I certainly considered that.

8          **THE COURT:**  Okay.  All right.  I'm not suggesting you

9  should be.  I'm just wanting to make sure I'm not leaving

10  anything unaddressed.

11      Okay.  The statute-of-limitations argument that -- forget

12  the class for a moment.  And just looking at Mr. Backus,

13  himself, he wants to go back to the first time he'd discovered

14  Coffee-Mate, it tasted pretty good -- or whatever reason he's

15  buying this stuff.  And he is saying that he was unaware that

16  it was bad for you, you know, until the FDA came out with its

17  determination.  Is that it?

18          **MR. WESTON:**  If I could correct that just a little

19  bit.

20          **THE COURT:**  Okay.

21          **MR. WESTON:**  He discovered it in the course of

22  talking to me about nutrition issues generally.  And this, I

23  believe, was in April of this year.

24      And it wasn't that he was completely and utterly unaware

25  that trans fat wasn't good for him -- I think everyone who has

a modicum of education knows that trans fat's bad -- but what

he did not know is that it needs -- it's unlike saturated fat,

which you can consume safely, just in moderation.  Rather, it's

something that is something that you should avoid completely,

and is extremely harmful, even in small amounts.  I think a lot

of the initial consumer education sort of lumps the two

together as bad fats, but they're really very different.  And

that was what he was unaware of.

      **THE COURT:**  Okay.  And that can be certainly an issue

that could be tried, but I don't know that on the face of the

Complaint, that he has failed to allege enough.  And we can

talk about that if you like, Mr. Giali.  I'm just trying to

kind of highlight what jumped out at me as perhaps, for lack of

a better word, more interesting issues in this large number

that we have.

    So then, taking up the question of primary jurisdiction --

okay? -- as you know, Judge Henderson has just issued an Order

finding in his case that it would be advisable to stay the

remaining claims, which -- I think he actually granted the

motion on implied warranty.  So is what's left in his case the

UCL claims for -- under the unlawful and unfair prongs, based

on the use of PHO in the baking mixes in his case?

      **MR. WESTON:**  Yes.  That's actually my case, as well,

Your Honor.

      **THE COURT:**  Yes.  I know.  That's why I'm asking you.

1          **MR. WESTON:**  I can speak to that.  The implied

2   warranty and the nuisance claim, which we didn't bring here, I

3   don't think were dismissed.  And the rest of the case was going

4   to go forward, pending an FDA ruling.  There were no fraud

5   claims in that case, at all.

6          **THE COURT:**  No.  I know that.

7          **MR. WESTON:**  There was no claim on it for not having

8   trans fat.

9          **THE COURT:**  Right, but you do have an

10  implied-warranty claim here.

11         **MR. WESTON:**  Yes.

12         **THE COURT:**  Okay.  You don't have a nuisance claim.

13         **MR. WESTON:**  No.

14         **THE COURT:**  But you have implied warranty.  Okay.

15      I'm not necessarily saying I agree with the analysis on

16  implied warranty in that case, but I just want to comment that

17  I believe that what's left in that case are the two UCL claims,

18  or at least the two prongs of the UCL; but he felt that then

19  those claims ought to be stayed, to allow the FDA to address a

20  petition that's been filed by an association of grocery product

21  manufacturers.  He noted in his case that General Mills, his

22  defendant, was a member of that association; that they had

23  either indisputably said or there was evidence showing that

24  they were.  There wasn't any other comparison with respect to

25  what that petition was seeking and what the composition of the

1    *General Mills* products is.

2         And in our case, there's even less of a showing,

3    Mr. Giali.  In other words, you've said there's a petition.

4    You've had the Court take a look at it.  And you haven't really

5    made a showing as to why that petition has anything to do with

6    Nestlé and the coffee creamers that are being challenged as

7    unsafe here.

8         If your client either has an interest in that particular

9    petition, or plans to file one of their own, or has filed one

10   of their own, then I would want to know about it, because at a

11   minimum, if I ruled against you based on an insufficient

12   showing right now, and then you come back with some motion for

13   reconsideration based on -- you just filed the petition, or

14   whatever, I don't want to start backtracking.  So maybe you

15   could make some kind of an offer, at least, as to what --

16        Why should we care that there is this petition that's

17   pending before the FDA, for a, you know, for lack of a better

18   word, "special dispensation" for certain kinds of products that

19   have PHO?  Okay?

20        He's busily taking notes.

21             **MR. WESTON:**  May I offer my evidentiary objections to

22   that?

23             **THE COURT:**  To the petition being introduced?

24             **MR. WESTON:**  Yes.

25             **THE COURT:**  Well, there's no declaration.

1      **MR. WESTON:**  I think that that's part of it.

2      What Mr. Giali did is attach someone else's declaration,

3   which then, in turn, attached a letter, which then, in turn,

4   said that there's a petition.

5      And I've actually contacted the FDA and said, "Can you

6   send me this petition, if it exists?"

7      And they said, "File a Freedom of Information Act

8   request."  It's not available on their website.

9      **THE COURT:**  Okay.  All right.  Well, that --

10   certainly, you don't want to have to go through FOIA to find

11   out if you want to challenge this other than on the fact that

12   the showing or the -- what do I want to say? -- the foundation

13   for it is subject to some dispute.

14      **MR. WESTON:**  And then, you know, that's, of course,

15   hearsay.

16      And then, of course, the other one, as the Court noted, is

17   there's the best-evidence rule.  The best evidence of the

18   petition is the petition, itself; not a declaration that this

19   is a letter that says there's a petition.

20      **THE COURT:**  You know, I wanted to see -- hang on a

21   minute -- where that is.

22      **MR. WESON:**  I believe it was attached to their reply

23   brief, request for judicial notice.

24      **THE COURT:**  All right.  I've got to find -- I've

25   ended up with about 11 packs of documents, in an effort not to

1    have to go through 3 feet of paper every time I want to find

2    something.

3              MR. GIALI:  Your Honor, it is --

4              THE COURT:  The problem is now I have to find the

5    correct tab.

6              MR. GIALI:  -- Document 34.

7              THE COURT:  Okay.  Just give me a minute.  Knob is

8    breathing down our neck here.  So fortunately, we managed to

9    get this down to one hearing this morning:  Yours.  So hang on.

10              MR. GIALI:  Specifically Document 34-3.

11              THE COURT:  Yeah.  Just a minute.  Hold on.  Well,

12    where did that go?  Well, just don't go anywhere, and I will

13    find it.  I have -- I know -- a whole stack of things that

14    concern a request for judicial notice.  Here we are.  I

15    think -- okay.  Which document is -- that should really be

16    flagged.  Which one is it?

17              MR. GIALI:  The Grocery Manufacturers Association.

18    Yes.  Okay.  It's Document 34-3.

19              THE COURT:  How about not using the document number?

20       Well, just a minute.  Let me see if I can do it that way.

21              MR. GIALI:  It's Exhibit 21.

22              THE COURT:  That's not --

23              MR. GIALI:  Exhibit 21.

24              THE COURT:  Oh.  No.  Wait a minute.  Okay.  I may

25    have someone from chambers actually locate it for me, in the

1   interests of time.

2          MR. GIALI:  There were two -- two requests for

3   judicial notice submitted by defendant that we did

4   consecutively order the exhibits.  So if there is an

5   Exhibit 21, there's only one of them.

6          THE COURT:  Okay.  Okay.  I have seen it.  What I

7   can't -- which -- was it attached to.

8          MR. GIALI:  GMA's cover letter was attached,

9   Your Honor.

10          THE COURT:  Other than that --

11   (Whereupon a document was tendered to the Court.)

12          THE COURT:  Okay.

13          MR. GIALI:  Your Honor, if I could speak to that one

14   point.

15          THE COURT:  Okay.  I have it.

16          MR. GIALI:  Okay.  The Grocery Manufacturers

17   Association absolutely submitted a food-additive petition

18   regarding PHO.  The problem that Mr. Weston and myself are

19   having is actually locating a copy of the filed document.  For

20   some reason -- and I don't know that anybody knows why -- the

21   FDA has not followed its normal procedure of attaching or

22   posting to its website an official filed document in an open

23   proceeding.  That's exactly what the food-additive petition is,

24   Your Honor.

25          If the FDA had done its job according to its rules and

1   regulations of posting duly filed food-additive petitions, it

2   would be available to the parties and the Court; and there

3   would be no question about whether or not the Court could

4   judicially notice that document.

5        I did want to address a point the Court made as to whether

6   our showing is sufficient, because we didn't, for example, say

7   that that petition relates to Nestlé or Coffee-Mate.  As a

8   matter of indisputable fact, Nestlé is on the Board of the

9   Grocery Manufacturers Association.  But, Your Honor, I believe

10  that doesn't matter one whit, because the primary-jurisdiction

11  doctrine relates to issues; not parties or products.

12            **THE COURT:**  Right.

13            **MR. GIALI:**  So the issue before the FDA is whether

14  PHO at any level is appropriate in food.  It doesn't matter if

15  Nestlé's a part of that.  This lawsuit implicates that issue.

16  And we've demonstrated to the Court that that exact issue is

17  squarely before FDA.  And it would certainly cover this case.

18  And that is what the primary-jurisdiction doctrine --

19            **THE COURT:**  Well, let's say that this petition was

20  looking to get approval for the inclusion of PHO at a

21  particular level, and no greater than that; and the Nestlé

22  product we're dealing with has a greater level.  Okay?  Then it

23  wouldn't be relevant, because they would be asked to find

24  something that wouldn't be applicable to the particular product

25  that we're dealing with.

1      Now, the Nestlé product has less than a half a gram.  And

2  the petition is asking for approval at what level?

3      None of this was discussed, as I say, in that kind of

4  detail.  And we have kind of secondary sources:  The petition.

5  But okay.

6          **MR. GIALI:**  We understand that dilemma the Court's

7  having.  And I think Mr. Weston --

8          **THE COURT:**  No, I'm not having a dilemma.

9          **MR. GIALI:**  Okay.  Well, not having those facts.

10          **THE COURT:**  You're having the dilemma.

11          **MR. GIALI:**  I'm sorry.  I'm sorry, Your Honor.

12      Not having those facts before the Court.

13          **THE COURT:**  Right.

14          **MR. GIALI:**  And Mr. Weston and I, I think, share the

15  Court's, well, maybe frustration at not having those facts.

16      I do believe, though, that that particular issue, again,

17  is not relevant to the primary-jurisdiction doctrine for this

18  reason.  Currently before FDA is the issue of how much PHO is

19  allowable in a product.

20      Even if the GMA petition is trying to get approval for a

21  level that's different than the Nestlé products, I don't

22  believe that would impact primary jurisdiction, either,

23  your Honor.  And here's why.  The FDA could not have been

24  clearer in its June 17 Final Determination that it is open for

25  business for the next three years on petitions for

1  food-additive approval.  That means they are looking at these

2  issues.  They are currently and fully engaged in these issues.

3      So even if the GMA petition isn't identical or synonymous

4  with Coffee-Mate, that doesn't mean that FDA has not opened up

5  this three-year period to consider all manner -- I don't

6  believe there is any rule, requirement, or guideline of the

7  primary-jurisdiction doctrine that the specific issue and

8  product -- and in this particular instance, PHO level -- has to

9  be before the FDA; only that general issue is being discussed.

10      And I don't think anybody could disagree.  Mr. Weston may,

11  but I don't think he will.  FDA is definitely looking at that

12  tissue of PHO levels.  So I don't think it's appropriate to

13  limit primary jurisdiction to that first additive petition

14  that's been logged in, which, by the way, none of us can seem

15  to get, because FDA hasn't posted it.

16          **THE COURT:**  Well, certainly you can make the argument

17  you've just made, but it would have failed to make a stronger

18  argument.  One can always make an argument that isn't as good

19  as a better one.  A better one would be:  We're on all fours.

20  Otherwise what you're left with is saying somebody's got a

21  petition, and maybe it's got something to do with us, and maybe

22  it doesn't, and maybe they'll look at another one.

23      It isn't like they're doing their own research, as I

24  understand it.  They're waiting for people to bring information

25  to them, and to make requests for what are essentially

1  exemptions or exceptions to the rule that they have already

2  made.  And they didn't indicate that they were unhappy with

3  their ruling necessarily.

4      They -- they said, "Look.  We're willing to look at this

5  if you bring it to us," but if nobody -- if you give a party

6  and nobody comes, there's no reason to wait until the party's

7  over.

8      Okay.  So you do have one petition.  Maybe there are

9  others.  We don't know about them if there are.

10     The description here, if we look at the exhibit -- you

11 see, I'm trying to figure out -- there's not a Bates number I

12 can use on this, so I guess just on the -- I'm trying to direct

13 your attention to a particular page of it.  I guess it would be

14 page 2, where the -- here it says, "The petition uses of PHOs

15 in or on foods are as follows."  And then there's a list of,

16 you know, three different uses.  And, frankly, I don't know if

17 those relate to our use here in Coffee-Mate, or not.

18         **MR. GIALI:**  Well, and one, I think, instructive

19 comment on that.  And I'm sure the Court's aware.

20 Judge Henderson did judicially notice --

21         **THE COURT:**  I just said it.  Of course, I'm aware.

22 No wonder you're sure.  I just said it five minutes ago.

23         **MR. GIALI:**  Right.  I don't believe there's anything

24 in the record of the *General Mills* case that would specifically

25 link the products at issue there.

1      **THE COURT:**  I said that, too.  And I'm not sure that

2  that's the end of the discussion.  If this were the

3  Ninth Circuit, your argument would be better.  It is a

4  well-respected Judge making a reasoned opinion, but it isn't

5  final, in the sense that it doesn't require me to make the same

6  finding.  And that's what I'm saying.

7      And they actually showed more than you did.  So Mr. Weston

8  could turn around and say, "Yes, but you didn't even show that

9  you belong to this association."

10      I'm going to give the court reporter her pen back, because

11  I found mine.  The record will reflect I'm returning it.  Okay.

12  Thank you.  So okay.

13      **REPORTER:**  Thank you, Your Honor.

14      **THE COURT:**  But I would be -- I'd at least consider

15  allowing you to supplement the record, or to -- because I don't

16  want to go through an idle act here; but I'm not sure that I'm

17  going to have you to do it, unless I think that it would make a

18  difference.  Okay?  If I think it would make a difference, then

19  we'll see.

20      Does anyone have any ideas, since you are more familiar

21  perhaps with the particular bureaucracy we're dealing with, how

22  long it might take the FDA to act on a petition; and in

23  particular this one, assuming it exists?

24      **MR. GIALI:**  I think it's always dangerous,

25  Your Honor, to predict how long it will take FDA.  My

1  experience is the FDA will take every bit of the three years

2  they've given themselves.  That would be consistent with the

3  way the agency works.

4       **THE COURT:**  In other words, it would be your

5  experience that they would not rule on the individual petition

6  or petitions as they came in, but would wait, and make some

7  kind of global ruling at the end of the three years, if it was

8  going to rule on the requests?

9       **MR. GIALI:**  I'm not a specialist as to whether they'd

10 make a global ruling, but my surmise is that they will take

11 every bit of the three years they've given themselves to deal

12 with, resolve, and respond to each of the petitions before it.

13      **THE COURT:**  All right.  Was that also made clear to

14 Judge Henderson when he --

15      **MR. WESTON:**  I failed to do that.  And here, more

16 generally, I have filed about 15 trans-fat cases, and have

17 never had one stayed because of primary jurisdiction.  So I

18 didn't really focus much on it, but what I wish I would have

19 had the opportunity to tell him and should have told him is

20 that these petitions -- there's a statutory rule that they're

21 supposed to be ruled on pretty quickly.  And the FDA simply

22 does not follow them.  And there's been a GAO report that the

23 FDA does not follow its statutory deadlines.

24      I can actually give some specific example of the FDA

25 taking more than a decade.  The initial trans-fat ban was the

result of two petitions, filed in 2004 and 2009.  As of 2013, I
took the case of --

     And they're supposed to come to at least a tentative
decision in 180 days.

     I took the second petition -- it was Dr. Kumra (phonetic),
a researcher at the University of Illinois -- as a client.  And
I sued the FDA under the Administrative Procedures Act for not
necessarily coming to the wrong decision, but for failing to
come to a decision.  And this was, again, four years rather
than 180 days it was supposed to come to it.

     And then finally in 2013, it came a few months after we
filed a suit to a tentative decision.

     On top of that tentative decision, it then took another
approximately year and a half to come to a final decision.

          **THE COURT:**  And you're talking about this -- this
decision that we have here?

          **MR. WESTON:**  Yes.  The Final Determination.

          **THE COURT:**  Okay.

          **MR. WESTON:**  And there are other examples of the FDA
taking 20, 25 years.  Even in the case of triclosan, which is
an ingredient that used to be put in hand soaps as an
antibacterial --

          **THE COURT:**  Yes.

          **MR. WESTON:**  That took 38 years from the initial --
FDA opening the docket on whether that should be a permissible

1  additive, to -- I think 2015 it finally came to its decision.

2        **THE COURT:**  What was their decision?

3        **MR. WESTON:**  They prohibited it.

4        **THE COURT:**  Oh, fine.  I stopped using those after I

5  started reading about them.

6        **MR. GIALI:**  Your Honor, if I could address the time

7  period, there are many Judges in this District who have been

8  concerned with how long the FDA takes to respond to these types

9  of things, and that justice delayed is justice denied.

10       And I think that maybe the issue the Court's getting at --

11  the Ninth Circuit put that to rest, Your Honor, just three

12  months ago in the *Astiana versus Hain Celestial* case, where, in

13  that case, the Ninth Circuit could not have been clearer if an

14  issue is appropriate for primary jurisdiction, it's appropriate

15  for primary jurisdiction.  And the FDA needs to take the time

16  it needs to take to complete that process.  In that case,

17  Your Honor, it was with respect to "natural" labeling of

18  cosmetics.

19       "Natural" labeling, as I'm sure the Court is aware, is the

20  subject of probably 300 consumer class actions; I bet

21  two-thirds of them right in this Court.  The Ninth Circuit made

22  it quite clear that even though FDA started looking at

23  "natural" decades ago, it is exactly the type of issue that is

24  appropriate for primary jurisdiction, and FDA should deal with

25  that.

 1         And the Ninth Circuit said that Judge Hamilton did not err

 2    in finding primary jurisdiction was appropriate there.  And,

 3    reading the express and additional teachings that come out of

 4    *Astiana versus Hain Celestial*, it's quite clear the

 5    Ninth Circuit is not concerned about how long it takes, if the

 6    particular issue falls within that primary jurisdiction.

 7         I believe here, that there's simply no -- there's no

 8    question if we walk through the FDA Final Determination -- and

 9    I think Judge Henderson did a tremendous job doing so -- it

10    ticks off those requirements.  This is a scientific issue.  It

11    is an issue that Congress has entrusted to a federal agency.

12    They're working on it.  And it's important.  We need

13    uniformity.

14         And so when you tick off those issues, plus understanding

15    that the FDA Final Determination makes it beyond dispute that

16    FDA is -- quote, unquote -- "on the job" on this issue, and has

17    given itself three years to complete its work --

18              **THE COURT:**  Okay.

19              **MR. GIALI:**  Okay.

20              **THE COURT:**  All right.  Let me go back for a minute.

21         Is there any way, while the FDA is looking into matters of

22    this nature, that one is able to track its progress, and see

23    whether it's actually doing something with whatever was

24    presented to them?

25              **MR. WESTON:**  Possibly.  The FDA will sometimes issue

1   a tentative one, and then ask for questions or comments.

2       But again, I have looked at the docket for triclosan,

3   which begins in 1975.  And there are -- there are periods of,

4   like, five or six years where nothing's on the docket; then

5   there's a little bit of activity in the nineties; then nothing

6   for a few more years.  So --

7       And what actually caused them to act in that case is the

8   NRDC sued them.  There's -- in addition to the health issue,

9   there's the environmental damage caused by it.  So only after

10  they were sued under the APA.  That seems to be what gets the

11  FDA to act.  It's what got them to act in both triclosan and

12  trans fat, after sitting on an issue for a decade.

13          **THE COURT:**  Okay.  Anybody stay their case during

14  those lengthy periods?

15          **MR. WESON:**  I don't think so.

16          **THE COURT:**  In any event, what I was going to say is

17  that there might be a way of seeing whether any developments

18  are occurring, but okay.  I want to --

19          **MR. GIALI:**  I'm sorry.  I did have a suggestion on

20  that, Your Honor, because Judge Chen -- in the

21  evaporated-cane-juice cases, Judge Chen actually wrote to the

22  FDA, and asked for information about the FDA's open file on

23  evaporated cane juice.  And the FDA responded to Judge Chen,

24  and said, "We anticipate completing our work" -- I think they

25  said -- "before the end of 2016."

1        **THE COURT:**  Okay, but there's still the assumption

2   here that because there's -- oh, a deadline of sorts that was

3   provided to the manufacturers, that the FDA may use that

4   deadline, itself, in terms of how long it would take to look at

5   the issues that we have here.

6        Now -- but okay.  All right.  It would seem to me that

7   although there are certain arguments that are being made on a

8   more general level, can you tell, by looking at page 2 of

9   Exhibit 21, assuming this is correct, as to what's before the

10  FDA; whether any of this matches what your client is doing?

11       **MR. GIALI:**  Your Honor, I apologize.  I'm not

12  prepared to provide that, but we would like to avail ourselves

13  of the Court's offer to submit a supplemental briefing.  And we

14  would be happy to match exactly what's on pages 2 and 3 with

15  whether or not those would apply, if that's what FDA did --

16  would apply to the particular products at issue in this case.

17       **THE COURT:**  I might.  I might allow you to do that.

18       I haven't said I would yet, but I might allow you --

19       **MR. WESTON:**  Your Honor --

20       **THE COURT:**  -- to do it.

21       If I did, of course, then there would be an opportunity

22  for Mr. Weston to weigh in also, further, but yes.

23       **MR. WESTON:**  I would say that it's very -- I think --

24  unfair for a Court to rule based on a document that's not

25  attached, that's not available to me, that was submitted on a

1  reply brief.

2      And I -- if the Court does not want to make a final

3  determination right now on primary jurisdiction, my preference

4  is the Court would deny without prejudice that.  And then when

5  the document actually becomes available --

6      Because I have other arguments on that, that I would like

7  to make.  One of the requirements for the petition is that it

8  demonstrate -- there's a consensus of scientific experts of the

9  safety of trans fat under the specified uses.  And I believe

10  that is just absolutely impossible.  And I can show several

11  scientific experts who'll defeat that requirement of consensus

12  of safety.

13      And I'd like to show them the petition, and show the Court

14  also that the petition is -- is going to be futile.  And I

15  understand it's not the Court's decision on what the FDA should

16  do with this.  However, the Court can at least have a peek at

17  it, and see:  Is this something that has a genuine chance to be

18  successful, or not?

19      And the other thing like I'd like to do is note that the

20  GMA had plenty of opportunity and, in fact, made for example

21  submissions in its members in opposition to the FDA's Final

22  Determination.  The FDA proposed this in 2013; finalized it in

23  2015.  They asked for additional time to give comments.  The

24  FDA granted that.

25      And I'd like to show that this petition is quite likely

1    almost identical to the submission and opposition.  And the FDA

2    certainly reviewed that.  And the FDA specifically said in its

3    Final Determination that you -- what you presented does not

4    establish a threshold of safety below which it can be used, or

5    any particular use.

6           **THE COURT:**  Let me ask you a question.  Can -- when

7    the FDA is looking at these exceptions or requested exceptions,

8    is it making a finding that there is -- that that level or use

9    is generally accepted as safe, or just its own determination

10   that it's safe?

11          **MR. GIALI:**  Your Honor, to the best of my

12   understanding, if -- if they were to allow that level, they

13   would be determining that at that use and level, that PHO is

14   Generally Recognized as Safe in food.

15          **THE COURT:**  Okay.  They don't make their own

16   determination of safety, so to speak, then?  They're always

17   looking to what the scientific community is saying?

18          **MR. WESTON:**  Yes.

19          **MR. GIALI:**  If I could, Your Honor, Mr. Weston, I

20   think, did an excellent job of explaining why primary

21   jurisdiction is so important.  If we take Mr. Weston at his

22   word, he's prepared to second-guess all of the scientists.  And

23   he's expected to do in this court on behalf of one product and

24   one ingredient.  That's exactly what primary jurisdiction is

25   designed to do when something is entrusted to a federal agency

1  whose job --

2          **THE COURT:**  Yeah.  I understand.

3          **MR. GIALI:**  Okay.

4          **THE COURT:**  It was not my intent to reopen the

5  subject fully or, frankly, to have a hearing beyond what is

6  judicially noticeable or in the Complaint already.  All right?

7      So it may be -- maybe I won't give you an opportunity to

8  supplement.  You thought your argument was just fine the way it

9  was; and maybe I should just leave it at that.

10      But let's look at the evidentiary objection.  I forget.

11  Did you make that objection earlier?  Are you just making it

12  now?

13          **MR. WESTON:**  No, Your Honor, I didn't have the

14  opportunity to make it in writing, but if I can repeat it

15  briefly --

16          **THE COURT:**  Well, yeah.  I understand it came in the

17  reply.  Right?

18          **MR. WESTON:**  Yes.

19          **THE COURT:**  By the way, why was it in the reply, and

20  not in your motion?

21          **MR. GIALI:**  I believe, Your Honor, it had to do with

22  the timing.  As you know, we're moving at lightning speed here.

23  These petitions are being resolved.  I don't know that the

24  petition -- I don't believe we knew whether or not the petition

25  was even filed at the time of our filing.

1          THE COURT:  Okay.  It's true that on -- on the

2    "natural," there's a motion in opposition, and a reply.  When

3    people have come up with something new in the reply, the other

4    side has often said, "Yeah.  Can we have a chance to address

5    this?"

6          But let's go over -- because maybe it would be

7    appropriate, given the fact it came up in the reply, to have a

8    little bit of supplemental briefing on the matter, because

9    Mr. Weston hasn't had a chance to respond.  In other words, I

10   haven't really fully thought about the particular evidentiary

11   objections that he's making.

12         I did notice that there was a request for judicial notice,

13   and that we didn't have an objection; but we didn't really have

14   an ordinary proceeding for Mr. Weston to do that.

15         But just so that we're clear, what is Exhibit 21, then?

16   What is it?

17              MR. WESTON:  It is --

18              THE COURT:  Well, let me see what the proponent of it

19   thinks it is.

20              MR. WESTON:  All right.

21              THE COURT:  And then if you don't like what he

22   describes it as, you can chime in.  Okay?

23              MR. GIALI:  Oh, I'm sorry.  I thought you meant the

24   author of the letter.

25              THE COURT:  You're offering it.  Yes.  Okay.  What is

1  it?

2          **MR. GIALI:**  I'm sorry, Your Honor.  I thought we were

3  going to reload it to see, but I believe it is the cover letter

4  or transmittal of a food-additive petition from the Grocery

5  Manufacturers Association, demonstrating that a petition has

6  been submitted to FDA.

7          **THE COURT:**  Well, not what it shows; just what is it?

8  When you say "demonstrating," that's your argument as to what

9  it does.  I'm asking:  What is it?

10          **MR. GIALI:**  With respect to judicial notice,

11  Your Honor, we believe --

12          **THE COURT:**  I'm just asking:  What is it?  Yes, it's

13  a letter that you understand is a cover letter to a petition in

14  which the petition is briefly described.  Right?

15          **MR. GIALI:**  Right.  We believe it's an official

16  record of the Food and Drug Administration.  We believe it is

17  formally filed, and it is part of the formal Government

18  records.

19          **THE COURT:**  "It" being?

20          **MR. GIALI:**  The cover letter.  The letter.

21  Exhibit 21.  And somewhere is the actual food-additive

22  petition, itself.  And for some reason, neither Mr. Weston nor

23  I can get a copy of that.

24          **THE COURT:**  Okay.  Now, the letter was available on

25  file?

1           MR. WESTON:  I don't know where it came from, other

2  than --

3           THE COURT:  Where does --

4           MR. WESTON:  -- it was submitted in another case.

5           MR. GIALI:  General Mills was able to obtain it.

6  They filed it in the *Backus versus General Mills* case before

7  Judge Henderson.

8      As soon as they filed it, Your Honor, we said, "There is a

9  copy of something."  So now we had a copy, as well.  And we

10  brought it to the Court's attention as best as we could.

11           THE COURT:  All right.  Okay.

12           MR. GIALI:  But I don't think Mr. Weston is disputing

13  that there is a food-additive petition by the Grocery

14  Manufacturers Association that is on file with the FDA.  We

15  just can't get a hold of it because, for some reason, the FDA

16  hasn't posted it.

17           THE COURT:  Right.  And how do you know there is a

18  petition?

19           MR. WESTON:  I don't concede that there is one.  I

20  think it's likely.  I doubt that the GMA is lying, but it is

21  hearsay here.  It's a letter saying, "Here's a petition."  The

22  petition's not attached.  Even if it weren't hearsay, it's not

23  the best evidence.

24           THE COURT:  No.  I'm not concerned about best

25  evidence at the moment.  The best evidence is the letter.  And

1  the letter isn't in his control.  All right.

2      But whether it is what it purports to be is one question.

3  There's no concession.

4      And whether or not there is a petition on file,

5  apparently, there's no concession, because at the moment you

6  can't even get your hands on the letter that might be

7  circumstantial evidence that a petition had been filed, because

8  somebody says "Here's our letter."  And if you could say the

9  letter is what it is, then you would be okay.  So we --

10          **MR. GIALI:**  Your Honor, I do have a suggestion.

11          **THE COURT:**  So we have some --

12          **MR. GIALI:**  I do have --

13          **THE COURT:**  Excuse me.

14          **MR. GIALI:**  I'm sorry.

15          **THE COURT:**  -- some evidentiary concerns here about

16  what is going on in Washington.

17      Now, do you have any idea why neither of you can find what

18  you both understand ordinarily would be on the file in the

19  public record if it were filed?

20          **MR. GIALI:**  I don't know, Your Honor; but I have had

21  success with FOIA requests to FDA, and have had responses

22  within a week or two to certain discrete things.

23      I believe if the Court is prepared to let the parties do

24  supplemental briefing on the GMA petition, I will get a FOIA

25  request out on Monday; and I believe we could have a response

1  to FDA.  And I will submit it to this Court as soon as I

2  receive it, which could be a week or two.  When you do a FOIA

3  request that asks for a specific document, the FDA is generally

4  very responsive and quick.

5          **THE COURT:**  Ah, okay.  I will think about that.

6      And then the scope of any briefing, if we have

7  supplemental briefing -- in other words, if I give you a chance

8  to make a supplemental submission -- I don't know that a

9  dispute about what the FDA might find is really appropriate for

10 me to be looking at, because we're just going to get into a

11 battle of studies, and what-have-you.

12     So I think we're looking more at what is the sufficiency

13 of the showing; what are the equities that apply here; the

14 legalities that apply; and to give you a limited number of

15 pages -- maybe 10 apiece -- to do something with it, not

16 counting the exhibit, itself, if you come up with it.

17     Now, there's another case out there.

18     By the way, does your client pronounce his name "Backus"

19 or "Backus"?

20         **MR. WESTON:**  I think either way is fine.  I'd

21 probably say "Backus."  I could be wrong, though.

22         **THE COURT:**  I'm just looking at it phonetically, and

23 it looks like "back" with u-s on the back of it.  Okay.  Well,

24 "Backus" then.  I'll pronounce it the way he might prefer.

25     There's another case pending; a case, I believe, in front

1  of Judge Ronald Whyte in San Jose.  Is that correct?  Does he

2  have an issue there, or am I confusing --

3          **MR. WESTON:**  Not one of mine.

4          **THE COURT:**  Pardon?

5          **MR. WESTON:**  That's not one of mine.

6          **THE COURT:**  That's not one of yours.  I was thinking

7  that there may be one that he had.

8          **MR. GIALI:**  There are several additional ones,

9  Your Honor --

10          **THE COURT:**  On trans fats?

11          **MR. GIALI:**  Yes.

12      -- including one before Judge Illston; one before

13  Judge Houston, down in the Southern District of California.

14  There's also a new case that Mr. Weston filed against Heinz,

15  which I think we reference in our -- in our brief, as well --

16          **THE COURT:**  Okay.

17          **MR. GIALI:**  -- in addition to the *General Mills* case.

18          **THE COURT:**  Okay.  Well, all right.  Let's see where

19  we've ended up here.  What time is it?  Just a little before

20  10:00.  I've touched briefly on some matters, but haven't

21  discussed them at any great length.

22      The -- I guess I'd be willing to hear a suggestion from

23  one or the other of you as to what you might like to discuss

24  that we haven't really explored.  We've spent quite a bit of

25  time now on primary jurisdiction.

1        **MR. WESTON:**  Well, for me, I think what I would like

2   the opportunity to discuss with the Court is the preëmption of

3   the --

4        **THE COURT:**  The advertising?

5        **MR. WESTON:**  -- fraud claim.  I know courts have

6   ruled against me, but I believe it's actually squarely covered

7   by *Reid*.   *Reid* covers no trans fat versus zero grams trans fat,

8   but I'd like the opportunity to show to the Court that those

9   are equivalent claims -- there is no distinction on them -- if

10  I may.

11       **THE COURT:**  You may, but haven't you made that

12  argument already?

13       **MR. WESTON:**  I'd like to explain it to the Court

14  better and with additional detail.

15       **THE COURT:**  You don't think -- well, you don't think

16  you did a good job already?

17       **MR. WESTON:**  I think I did, but I think I was

18  convincing.  I'll put it this way.  We called out the defendant

19  for not citing, at all, 101.62, which is something that is

20  discussed in *Reid*; and specifically both its header and its

21  contents say it governs nutrition-content claims for fat, fatty

22  acid, and cholesterol.  And the beginning of that says, "Only

23  the following claims are authorized."  And it has authorized

24  saturated and trans-fat claims, and authorized cholesterol

25  claims; but it does not say anything about trans fat.

1    And the Ninth Circuit, in looking at that, said, as

2 initial matter, nutrient-content claims are not permitted.

3 That's the default.  You're not allowed to make them.

4    And the Court spoke of muzzling.  It's actually the FDA

5 that muzzles manufacturers from making these claims.

6    101.62 says only the following fatty-acid claims can be

7 made; the ones authorized in this Section 101.62.  And the FDA

8 said, "No trans fat" is not one of those claims.  And "zero

9 grams trans fat" is equally not one of those claims.

10    So the analysis in *Reid* would apply exactly the same as it

11 would here.

12    And the others --  and again, in both of the defendant's

13 briefs they do not cite even once the one relied on by the

14 Ninth Circuit:  101.62.

15        **THE COURT:**  Okay.  Did you want to say any more about

16 that, or --

17        **MR. WESTON:**  Yes.  Well, then the Ninth Circuit sort

18 of continued, after noting the initial background rule, only

19 certain claims are authorized.  There's no "zero grams trans

20 fat" authorized; therefore, it's not permitted.

21    And then the FDA said if we had any doubt about this, we'd

22 look at the fact that the FDA considered doing it and chose not

23 to, in light of insufficient scientific information; but I'd

24 point out even further that when the FDA does authorize these

25 fat claims, it's very concerned about just what happened here,

which is taking something from the nutrition label -- the
Nutrition Facts box -- and putting it in the front in a
misleading way.

And that's exactly what we allege here.  And I'll give you
a few examples.  One is with saturated-fat claims you are not
simply allowed to say "zero grams saturated fat" if the label
says it on the back.

So you -- there are several other requirements.  Among
other ones is that it has to be -- if you do do that, it has to
be a product that has been processed in a way to reduce fat,
and has to not have trans fat be the substitute for saturated
fat, and so forth.

Same thing with cholesterol.  You're not simply allowed to
say "zero grams cholesterol" or "zero milligrams cholesterol"
blindly.

Now, the FDA didn't say anything at all about it, but it's
clear to me that, with trans fat being far more dangerous than
either dietary cholesterol or saturated fat, had it decided to
authorize one, it would have put additional conditions on them;
and one of those additional conditions, in my view, would have
been that a product like this, which has extremely small
serving size --

Because this product, by weight, is very high in trans
fat; higher than almost anything else you could consume.  It's
extremely high, by weight.

1     But the serving size is so tiny.  And that's sort of a

2  loophole that would allow them to say on the Nutrition Facts

3  box that zero.

4     But part of what the FDA does is make sure that the

5  Nutrition Facts box, which is mandatory, and has to have very

6  simple rules, cannot then create something that's misleading

7  when placed on the front of the label.

8     So I think, again, the burden on preëmption is a very

9  difficult one.  Contrary to what defendants said in their

10  brief, the California Supreme Court, in *Farm Raised Salmon*,

11  said the presumption against preëmption applies in food cases

12  brought under the UCL.  And I don't see how the defendant

13  possibly could have met that burden, even if it was right,

14  without citing anywhere in their opening or reply brief 101.62,

15  which specifically covers this, and was the basis of the

16  Ninth Circuit's Decision.

17     With regard to the distinction between "no trans fat" and

18  "zero grams trans fat" for the claims that are authorized, the

19  only claims about fat that are permitted on the front label --

20  the FDA has little groups.  And one of them is "zero fat" or

21  "zero saturated fat"; and another one is "fat free" or

22  "saturated fat free."  And in those little lists, they are all

23  sort of equivalent, and they're all treated the same.  So at

24  least with saturated fat, the FDA does not hold any distinction

25  between "zero saturated fat" or "saturated fat free."  The same

1  regulation applies to those.

2         **THE COURT:**  I was just looking at *Reid* for the

3  reference or discussion that you were particularly persuaded by

4  or relying on.

5         **MR. WESTON:**  It cites 101.62 three or four times.

6         **THE COURT:**  I've got to find one of those, just so we

7  can take a look at it while you're arguing.

8         **MR. WESON:**  The discussion is primarily on pages 960,

9  or starting there.

10        **THE COURT:**  Okay.  Okay.  Just a minute.  Okay.

11  Where do we have 101.62 -- is what I'm double checking.  Oh.

12  Here we are.  Hm.  Hold on a minute.

13  (Pause in proceedings.)

14        **THE COURT:**  Now, I just may be missing the point.

15  Okay?  They do mention it in passing, I guess you could say, on

16  page -- what was that? -- 960; but I'm not clear how that makes

17  your point.

18      In other words, you're saying since there are certain

19  types of phrases that are allowed, you can't use phrases that

20  are not specifically allowed?

21        **MR. WESTON:**  Yes.  In fact, both the regulation and

22  the Ninth Circuit does.  And I will quote them.  21 C.F.R.

23  101.62(a) says, "A claim about the level of fat, fatty acid,

24  and cholesterol in a food may only be made on the label or

25  labeling of foods if the claim uses one of the terms defined in

1   this section in accordance with the definition of that term."

2           THE COURT:  Okay.

3           MR. WESTON:  No such claim is defined.  And, again --

4           THE COURT:  I think what your argument is --

5           MR. WESTON:  Yes.

6           THE COURT:  -- is that there isn't a similar

7   provision for trans fats; but if there were, it would be at

8   least equally restrictive?

9           MR. WESTON:  That's correct, Your Honor.

10          THE COURT:  Okay.

11          MR. WESTON:  And, you know, as the Ninth Circuit

12  said, by definition -- the general rule --

13      I'm also going to quote from *Reid* on page 959.

14          THE COURT:  Okay.  Let me go back to it, just so that

15  I have that.  Where are you on that page?  Which paragraph?

16          MR. WESTON:  I'm sorry.  I'm not quoting from it --

17          THE COURT:  Well, okay.

18          MR. WESTON:  -- but it is on page 959.  It says under

19  FDA regulations, the general rule is that nutrient-content

20  claims are not permitted on food labels.

21      And so there -- that's the general rule.

22      And the Ninth Circuit, knowing -- with that general

23  background rule -- looked to see if there is an exception.  And

24  the place there would be an exception would be the specific

25  regulation, 101.62, for fat and cholesterol claims.

1          THE COURT:  Okay.

2          MR. WESTON:  And it -- it said -- this is, again,

3  quoting from *Reid* on the next page.  "The FDA considered

4  authorizing a trans-fat-free claim, but decided not to enact

5  the regulation."

6          THE COURT:  Okay.  Hang on.  I'm just going back to

7  101.13, which they do consider to be significant.

8          MR. WESON:  Well, what 101.13 says is for the

9  authorized regulations, one of those rules is you need to -- to

10  say the same thing on the label -- on the nutrition label as

11  the front label.

12          THE COURT:  Right.

13          MR. WESTON:  And that, again, was the argument that

14  was made by the defendant in *Reid*.  And what the Ninth Circuit

15  said about that is a requirement to state certain facts in the

16  nutrition label is not a license to make the statement

17  elsewhere on the product.  It is one of the conditions, but it

18  is only one of those conditions.

19      For certain ones, if there's no background regulation or

20  no specific regulation, that may be the only requirement; but

21  here we have a specific regulation that says, "only the

22  following fat-content claims may be made on the label."  And

23  there's simply not a trans-fat one there.

24          THE COURT:  I should have 101.3, and I don't see it

25  here.  So okay.  I wanted to just take a look at it.  Wait a

 1  minute.  Maybe I do.  Nope.  I don't.

 2          **MR. GIALI:**  Your Honor, we have included in excerpt

 3  of --

 4          **THE COURT:**  Oh, no.  I do have it.  Sorry.  Yeah.  I

 5  thought I did.  I think I just skipped over it.  So yes.  Okay.

 6      Well, you know, it's the argument that you have made.  And

 7  I'll go back, and I'll review it again with those particular

 8  points in mind.

 9      And then if you want to say anything -- again, not at too

10  great length, because both of you did, you know, brief this at

11  some length -- but Mr. Giali, if you wanted to add anything at

12  this point, you're --

13          **MR. GIALI:**  If I could add a few points, Your Honor,

14  I think we can short-circuit.

15      When Mr. Weston talks about 101.62, he's talking about

16  nutrient-content claims that are allowed specifically that

17  characterize a nutrient.  The FDA sees certain words like

18  "low," "no," "high" as characterizing; but as the Court

19  correctly went to, Your Honor, we're not in 101.62.  We say

20  "zero grams trans fat."  That is clearly within 101.13(i)(3).

21  And there, the FDA makes clear in its regulations that if you

22  are simply declaring the amount or percentage of a nutrient,

23  and it does not in any way characterize the nutrient -- and FDA

24  believes words like "no" characterize the nutrient -- then you

25  are allowed to do it.

1      And they give two examples.  One of them is

2  "100 calories."  And guess what the other one is.  "5 grams of

3  fat," Your Honor.

4      That's where we fit:  In 101.13(i)(3).  And that's in our

5  appendix.  We have an appendix to our motion which sets out our

6  express preëmption, and it's right there.

7      So what Mr. Weston is doing is he's taking a regulation

8  that doesn't apply to this particular labeling statement, and

9  he is trying to squeeze us in here.

10      *Reid* is absolutely consistent with what I'm saying,

11  because in *Reid*, as the Court's already pointed out and as the

12  Ninth Circuit makes clear, it was not "zero grams trans fat,"

13  Your Honor; it was "no trans fat."

14      The Court asked earlier in this session:  Why does FDA

15  allow "zero grams," and not "no"?  There is a simple answer to

16  that, Your Honor, and here it is.  FDA scientists, in their

17  wisdom, believe that anything less than half gram of trans fat

18  per serving is so trace and so infinitesimal, that it's

19  meaningless to them, and they don't want consumers confused.

20      So FDA passed a regulation that said if it's less than

21  half gram per serving, put -- not you may; you shall put

22  "zero," because we don't want to confuse consumers.  That's why

23  it's a zero-grams-trans-fat rule.

24      Mr. Weston's well aware of this.  He briefed that in *Reid*,

25  in order to preserve his no-trans-fat claim.  Mr. Weston

1  briefed to the Ninth Circuit that zero grams trans fat is to be

2  treated differently.

3      And I have one additional point I'd like to make

4  Your Honor.  And that is in *Reid*, the Ninth Circuit made quite

5  clear it was basing its decision on FDA's own interpretation of

6  its rules.  And in *Reid*, the Court relied on two warning

7  letters.  Your Honor, we have put those warning letters from

8  *Reid* before the Court.  And in those warning letters, it could

9  not be clearer that FDA recognizes zero grams trans fat.

10      So, Your Honor, this is in Exhibit 19 that we submitted.

11  And if we go to page 2 of 4 -- this is Docket 34-1, page

12  2 of 4.  Here's what the FDA says.  They are writing a warning

13  letter.  This is the exact warning letter relied on in *Reid*,

14  to a company called "CytoSport™," who makes Muscle Milk®.

15  Quote, "Your Chocolate Peanut Caramel Muscle Milk® product

16  label bears the nutrient-content claim 'Zero grams trans fat.'"

17      The FDA goes on.  "This statement is a nutrient-content

18  claim provided for in 21 C.F.R. 101.13(i), just like we spoke

19  about.  It's not a 101.62 issue.

20          **THE COURT:**  Okay.

21      **MR. GIALI:**  The exact same thing in the very next

22  warning letter.

23          **THE COURT:**  Well, okay.  Since it's the exact same

24  thing --

25          **MR. GIALI:**  Okay.

1       **MR. WESTON:**  I can rebut that very quickly.

2       I do concede that it's covered by .13.  The header in .13

3   is "Nutrient-Content Regulations, General Provisions."

4       The header of 21 C.F.R. 101.62 is as follows.  "Nutrient

5   Content Claims for Fat, Fatty Acid, and Cholesterol Content of

6   Food."

7       The header above that is Subpart D, "Specific

8   Regulations."

9       And, in fact, 101.13, in the body of it, says these are

10  our general ones, and they must comply with both this one and

11  Subpart D.  So even if the FDA, citing .13 -- .13 cites Subpart

12  D, which includes .62.  And, of course, the specific regulation

13  applies on top of the general regulation.

14      And again, defendant has never, in either of their briefs,

15  described why it thinks that .62 relied on by that

16  Ninth Circuit does not apply here.  It did not mention .62,

17  even though, as the proponent of preëmption, it had the

18  obligation to do so.  And on its very face, it does apply.

19      **THE COURT:**  Okay.  I think even the Ninth Circuit has

20  acknowledged it's a parallel regulation, not necessarily

21  directly applicable.  So --

22      **MR. GIALI:**  Your Honor, that's correct.  And of

23  course the *Carrea* Decision, which Mr. Weston likes to disparage

24  as nonpublished, was a Judge Kozinsky Decision, where he took

25  up this exact issue.  And he found that "zero grams trans fat"

1   is allowed and authorized.  And a suit like Mr. Weston's is

2   expressly preëmpted, because it would prohibit and bar.

3          **THE COURT:**  Okay.  We've covered all of that terrain

4   before.  Unfortunately for you, Mr. Giali, Judge Kozinsky

5   didn't see fit to publish his Decision.  So that leaves us with

6   a little bit of a gap here in the authority.  Okay.  So

7   Mr. Weston wanted to talk about that.

8       How about from your standpoint?  Was there something here

9   you wanted to cover?

10         **MR. GIALI:**  Yes, Your Honor.  We have yet to talk

11  about the use and the conflict preëmption.  That's the

12  so-called *"Geier* argument."

13         **THE COURT:**  Well, if you're relying -- well, let me

14  ask you.  Are you relying on the fact that at this point, the

15  FDA is allowing for this three-year period to continue to sell

16  the product?

17         **MR. GIALI:**  That, but much more, Your Honor.

18         **THE COURT:**  Well, the "much more" is how briefly

19  stated?

20         **MR. GIALI:**  Okay.  It's not that FDA is simply

21  allowing for three years.  It's that that three-year period is

22  an integral part to the carefully calibrated system that FDA

23  has set up to deal with partially hydrogenated oil.

24      If -- if you read through the Final Determination, one

25  thing's abundantly clear.  The FDA is taking its time.  It's

1  getting expert opinion.  It's hearing from industry.  It's

2  hearing from people like Mr. Weston.  And it has made decisions

3  as to how best, as the agency in charge, to deal with this.

4      And a crucial part of that -- a crucial part; not a side

5  part, but a crucial part of that -- is a three-year period,

6  because the three-year period allows for food companies to find

7  additional or substitute oils, but it also allows for food

8  companies to bring additional information to FDA for FDA to

9  make its final decision in June of 2018.

10      **THE COURT:**  Yeah.  That's the three-year argument,

11  though.  I --

12      **MR. GIALI:**  Okay, but it's not just three years,

13  Your Honor.  It is three years that is an integral part to

14  their program.

15      **THE COURT:**  Well, they've made a Final Determination

16  here.  And they have said, you know, interestingly --

17      Let me see if I can get that Decision back in front of me

18  for a minute.  Hm.  Too many difficulties finding things here.

19  Hold on.  Okay.  Just a minute.  Let me see if I can find that

20  packet, if you will.  And once I do that, I can -- oh, here we

21  are.  Yeah.  Okay.  So let me just go to one aspect of that, if

22  I can.  And I'm not sure where I've got that flagged, if at

23  all.

24      **MR. WESON:**  Your Honor, on page 14 we state the FDA's

25  own position within the Final Determination of its preëmptive

1  scope -- the only mention of preëmption there is as follows.

2        **THE COURT:**  Now just a minute.

3        **MR. WESTON:**  Okay.

4        **THE COURT:**  I thought -- I know that they made an

5  express statement about it.

6      What I can't, for whatever reason, find -- it's not

7  flagged.  And I may be looking at the wrong document.

8        **MR. WESTON:**  It is on page 14 of our opposition to

9  motion to dismiss.

10       **THE COURT:**  Well, not really your page.  I was

11 looking for it in the document.

12       **MR. WESTON:**  Oh.

13       **THE COURT:**  Now I don't know why -- oh, yes.  Here we

14 are.  It's on page 9 of their document.  Okay.

15     They say --

16     One might have accepted what you're saying, Mr. Giali.

17 And you're absolutely right that the Court should address this

18 point, because it's an important one.  At first blush, one

19 could say that the FDA, for a number of reasons, states that it

20 is giving the industry time not just to file petitions,

21 frankly; but time to get their act together, essentially, and

22 not -- not to create too much of a burden on either the

23 manufacturers or the public while they're looking for a

24 substitute.

25     Frankly, I don't know how good palm oil is as a

substitute.  They're talking about palm oil.  I don't know how great that is.

But anyway, they now go through this whole policy discussion.  And one could say, if that's all you had, that, yes, there could be an implied preëmption here that immediately finding that this product cannot be sold runs contrary to the objectives that the FDA had stated it was acknowledging.

Okay.  Then they say at page 9 -- and just totally confuse everyone by doing this, then -- "We decline to take a position regarding the potential for implied preëmptive effect of this Order on any specific state or local law, as such matters must be analyzed with respect to the specific relationship between the state or local law and the federal law.  FDA believes, however, that state or local laws that prohibit or limit use of PHOs in food are not likely to be in conflict with federal law, or to frustrate federal objectives."

Now, you made an argument that, well, they're talking about statutory laws essentially, and not common law.  Yet in their very first part of that paragraph, where they're talking about express preëmption, they say there is no statutory provision in the FD&C Act providing for express preëmption of any state or local law prohibiting or limiting use of PHO in food, including state or local legislative requirements or common-law duties.

They don't distinguish, when they get down to implied

1  preëmption, their definition of state or local laws.  They

2  apparently think it includes case authority and other law that

3  may be developed in a state.

4      So it's true you just have a derivative law here.  You

5  don't have a direct law that states, "PHO can only be sold in

6  restaurants if you put on the menu, 'There's PHO in the food,'"

7  which, of course, no one would do, which is why they have

8  restaurant regulations in some states.

9      But the -- it just seems like they've said, "We're not

10  going to stop you.  If somebody wants to, they can."  That's

11  how I read it.

12          MR. GIALI:  I do have a couple of comments on that,

13  Your Honor.

14      There is -- in California and New York, there are specific

15  statutes that limit -- don't bar; limit -- PHO.  And, in fact,

16  I think Mr. Weston would even concede that the products in this

17  case would pass those laws, because of less than a half gram.

18      But that's the statutes that FDA is thinking about:  Those

19  statutes.

20      And an important part about those statutes -- those --

21          THE COURT:  Let me just stop you.

22      If they said limit, yes, you might have an argument that

23  if all they were saying is if you want to restrict it to

24  certain circumstances or under certain circumstances, we'll

25  take a look at those.  We don't think that will be a problem,

1  perhaps having in mind statutes that are already on the books.

2  But they don't just say "limit."  They say "prohibit."  That's

3  a total ban:  Prohibit.

4      **MR. GIALI:**  And that's okay, too, from my

5  perspective, because Mr. Weston doesn't cite any such law.

6      And the UCL certainly isn't that law.  Mr. Weston trying

7  to expand it to be that, but it's certainly not that law now.

8  And FDA would have no reason, when they wrote this, to think

9  that there is a law in California prohibiting it, other than

10  for restaurants and schools.  And I do want to make that

11  important point.

12      **THE COURT:**  I'm sorry.  Other than what?

13      **MR. GIALI:**  For restaurants and schools.

14      And here's the important point on that, Your Honor.  The

15  California Legislature understands that kids who get food in

16  schools, and folks like all of us who get food at restaurants,

17  have no opportunity to read the ingredient list.  They have no

18  opportunity to see a nutrition-facts panel.

19      **THE COURT:**  That's what I just said.

20      **MR. GIALI:**  Okay.  So then there's another point,

21  Your Honor.  Let's assume -- and I think the Court is exactly

22  right on this -- that FDA has punted on implied preëmption

23  issues.  The *Farina* Court makes it quite clear that it's this

24  Court's job to answer that question.

25      So *Farina*, which is 625 F. 3d., at 126 to 127, walks

1  through this exact thing, and even discusses the fact that:

2  What if the federal agency makes confusing statements?

3      And you know what that Federal Circuit decided is they

4  said, citing *Geier*, the United States Supreme Court -- what

5  they said is when the federal agency is confusing about what it

6  is attempting to do, we just disregard it.  And we ask.  We now

7  go back to the base elements.  And those base elements are:

8  Did the federal agency make a policy decision, weighing all

9  kinds of inputs, and then come up with a proposed plan that

10  balances risks, rewards, harms, benefits?

11      If the federal agency did that, that is the situation

12  where primary jurisdiction -- I'm sorry -- where conflict

13  preëmption will apply, if what a state is trying to do is put

14  up an obstacle.

15      Mr. Weston's case -- without question -- will be an

16  obstacle to the three-year period.  There's no question.  He

17  wants to sue now for partially hydrogenated vegetable oil now

18  in products today.  That's an obstacle to FDA's determination

19  that the three-year period is an important, integral part of

20  their plan with respect to PHO in the United States' food

21  supply.

22          **THE COURT:**  Okay, but what about that they say --

23      It's one thing if you wanted to just say that they were

24  making a comment about the law.  And you say, "Okay.  Well,

25  maybe they don't know what they're talking about."  All right.

1          But when they're talking about their own objectives,

2    then --

3               MR. GIALI:  As to that, I'm convinced they don't

4    say -- I'm convinced that they are referring to these laws that

5    exist on California books.

6               THE COURT:  No, no.  I'm sorry.  They say "or to

7    frustrate" -- oh, you're back to that they're talking about --

8               MR. GIALI:  Correct.

9               THE COURT:  -- specific statutory provisions.

10              MR. GIALI:  Correct.

11         And, Your Honor, if we think about it, that's the only

12   thing they can be thinking about.  Mr. Weston is an incredibly

13   creative and relentless adversary.  And he and I have been in

14   lawsuits together for about six years now.

15         The FDA can't possibly predict what Mr. Weston is going to

16   do tomorrow, let alone a month or twelve.  So they're not

17   thinking about Mr. Weston's cases.  They're thinking about:

18   What has the California Legislature already done?

19         And what the California Legislature's done is banned --

20   not "banned" -- prohibited food in restaurants and served at

21   schools without labels -- without nutrition facts -- that have

22   more than or half gram or more per serving.

23              THE COURT:  Okay.

24              MR. GIALI:  That's the laws they're clearly talking

25   about.

1    **THE COURT:**  All right.  I'll take another look at it

2  to see.  Maybe, you know, you'll convince me to the contrary of

3  what my first impression was.  Well, actually, my first

4  impression was it may be preëmpted.  Then I was reading their

5  own viewpoint about what they think would be contrary to what

6  they're trying to do.

7    And then you're saying, well, you know, if they don't know

8  what they're talking about or it's confusing, then you can

9  disregard it.  And I'll take a look again.

10    **MR. GIALI:**  Your Honor, I wonder if I may be so bold

11  to offer a Judge-Chen-style solution to this.

12    Let me go back for a second.  When FDA had a telephone

13  conference --

14    **THE COURT:**  I'm not calling them up.

15    **MR. GIALI:**  No, no.  I'm not asking for a phone call,

16  Your Honor.  I don't mean that.

17    FDA had a telephone conference when it announced its Final

18  Determination.  And it invited industry and whoever wanted to

19  listen in.  They were asked about this very issue, Your Honor.

20    **THE COURT:**  What issue?  The preëmption issue?

21    **MR. GIALI:**  Yes, because industry is concerned about

22  consumer class actions.  And while it certainly wasn't a formal

23  statement by the FDA, certainly folks like me understood that

24  what FDA was trying to do by this three-year period was

25  prohibit these types of claims.

1     Don't believe me, and don't believe my recitation, but

2 here's what I think might work.  Writing to FDA, explaining

3 what this case is all about, and asking them, now that they've

4 seen what a consumer class action looks like:  Do they have a

5 position on implied preëmption?

6     **THE COURT:**  Why don't you write them?

7     **MR. GIALI:**  I don't -- I don't know that that would

8 be -- I don't know whether that would have the exactly the same

9 impact as if a Court said, I have now read your preëmption

10 statement.  It is clear as mud.  I now have a case before me.

11 And I don't know if this is one that, now that you know about

12 it, you would say conflicts or is an obstacle to your --

13     **THE COURT:**  If only one could just write the

14 Legislature, write Congress, and say, "Gee, this is really a

15 bad law.  What were you people talking about?  We're spending

16 years litigating over your intent."

17     That doesn't really happen.  And I'm not going to write

18 the FDA.  I'll take whatever they've said as a given.  I will

19 consider it in the context of what you're arguing.  And maybe

20 you'll convince me; or in a review of *Farina*, I might, you

21 know, decide that whatever they've said should just be

22 disregarded.  But at the moment, it is their statement.  They

23 bothered to weigh in on it, for whatever reason, and left us

24 with a rather bold statement on their part.  And if they were

25 thinking of something that they didn't mean, there's no way to

 1  tell it from this writing or the context in which it's stated.

 2       So I will think about it, though, because, as I say, I

 3  meant to get back to this, and for some reason I just didn't

 4  You know, my first impression was that stopping everything in

 5  its tracks might be considered contrary to the objectives that

 6  they were trying to accomplish.  In the same light, they were

 7  saying, "No, no, it doesn't."  So let me take another look at

 8  it.  And I will.

 9            MR. WESTON:  May I address that point, Your Honor?

10            THE COURT:  Very --

11       Briefly.

12            MR. WESTON:  I can be --

13            THE COURT:  -- briefly.

14            MR. WESTON:  -- very brief on it.  I can be very

15  brief on it.

16            THE COURT:  We've been out here for an hour and a

17  half now.

18            MR. WESTON:  Okay.  I can be very brief on this.

19       First of all, here's a very unique case, where the FD --

20  or excuse me -- the Transportation Department specifically

21  wanted cars without airbags.  And they had specific reasons.

22  They wanted to see if passive restraints in these early days of

23  airbags would be more effective, as a safety measure and a cost

24  measure.

25       And that situation, defendants have been saying again and

1   again, applies.  And case after case says "No."

2        Every regulation balances interests, as the defendant

3   said.  Few regulations specifically say there's this thing

4   that's a positive -- airbags -- but we specifically don't want

5   them there all of the time.  And then you have a state tort

6   claim against it.

7        The other very brief point is there -- we're not just

8   doing the UCL here.  The UCL -- we have an unlawful prong.  And

9   the unlawful prong is over California's prohibition in its

10  California Sherman Law on the sale of adulterated foods.

11  Adulterated foods are ones that have unapproved food additives,

12  like trans fat.

13       So if you go to paragraph 107 our Complaint, on page 30,

14  second cause of action, we say specific statutes that the use

15  of trans fat violates.

16            THE COURT:  No.  I understand.  And, in fact, there's

17  a federal statute that says you can't sell adulterated food.

18  And then there's a question how the FDA is saying, "Yes, you

19  can, for three years."  So anyway, we have a number of points

20  here.

21       I want to ask a couple of questions of my own before.  Was

22  that what you wanted to take up primarily:  The preëmption?

23       In other words, he wanted preëmption on the labels.  You

24  want preëmption on use, or vice versa.  But now --

25            MR. GIALI:  Yes, Your Honor.

1      **THE COURT:**  Any other points?  Don't argue them, just

2  tell me what they are.  And I'll see how we're going to handle

3  them.

4      **MR. GIALI:**  I think we've covered what was on my

5  list.

6      **THE COURT:**  Okay.  Here's my question.  Okay?  In

7  this whole universe of determining whether something is

8  Generally Recognized as Safe, what is the legal effect of a

9  determination by the FDA?  Is this the final word?

10      Let's say it is final; in other words, that they're not

11  going to change it.  They're not changing anything by petition.

12  This is what they said, and that's what sticks.  That's their

13  opinion.

14      Is it subject to challenge; and if so, where, and by whom?

15      **MR. GIALI:**  Yes.  A Generally Recognized as Safe

16  determination is absolutely subject to challenge.  It's the

17  same, I think, as any administrative decision.

18      **THE COURT:**  All right.

19      **MR. GIALI:**  You could take that all the way to the

20  Supreme Court.

21      **THE COURT:**  Okay.

22      **MR. GIALI:**  I --

23      **THE COURT:**  But it is for the moment, the last word,

24  unless set aside by a Court?

25      **MR. WESTON:**  Yes.

1        **THE COURT:**  In other words, it has the effect of law?

2        **MR. GIALI:**  Yes.

3        **THE COURT:**  So when they make their finding that it's

4 not Generally Recognized as Safe, then you start looking at the

5 statutes that say, If something is not recognized as safe, it's

6 an additive, unless you get an exception.  And then it's -- you

7 put it in food, and the food's adulterated.  And you can't sell

8 adulterated food because it's unsafe.  And you go down the line

9 from there, starting with this finding, unless it's set aside

10 by a Court.

11        **MR. GIALI:**  Your food would be misbranded and/or

12 deemed adulterated by FDA.

13    I do -- I would like to make one point, though,

14 Your Honor.  The FDA is not saying PHO is generally recognized

15 as unsafe.

16        **THE COURT:**  No.  I understand that.

17        **MR. GIALI:**  And they're only saying it's generally

18 recognized/not generally recognized.  And I think the Court

19 does understand the distinction.

20        **THE COURT:**  No.  I understand the distinction between

21 a finding that something is unsafe, and a finding that someone

22 has not generally recognized or the scientific community hasn't

23 generally recognized that it is safe; but the statutes that go

24 off from that point are essentially calling it unsafe, which is

25 not what the finding is.

1     Nonetheless, that's what they seem to be saying.  And so

2  that seems to be taking it further.  And that's why I did ask

3  that.

4     I think I understand that when the FDA does not weigh in

5  one way or the other -- in other words, it's not on their

6  noninclusive list of okay -- the additives -- or not additives,

7  but substances -- and it's not on the list -- their bad list.

8  And you have this kind of open question; that the manufacturers

9  can self-certify, in effect, which is them saying, "In our

10  opinion, it's fine."  And then you wait until -- I guess that

11  could be challenged, also, in court?

12        **MR. GIALI:**  That's correct, Your Honor.

13     There is a third category.  There is self-determination.

14  There's GRAS by formal decree of FDA; but there is substances

15  that were in food prior to 1958, and that's how many

16  hydrogenated oils are GRAS determined.  It is important to

17  understand that there a many substances that were in use prior

18  to 1958.

19        **THE COURT:**  Okay.  That's an argument.  I just want

20  to get a --

21     Oh.  And is this going to be a procedure that you are

22  you're telling me?

23        **MR. GIALI:**  Well, correct.

24        **THE COURT:**  Because I don't want a whole story.

25        **MR. GIALI:**  Understood.  Correct.

1    Water, for example.  Water has never been formally

2  recognized as GRAS.

3         **THE COURT:**  Okay, but there are all kinds of things.

4         **MR. GIALI:**  That's my point.  That's my point.

5         **THE COURT:**  I've already certainly acknowledged that.

6  And that's why I was asking.  Let's say that before this

7  determination came out, could Mr. Weston have filed a lawsuit

8  with the exact same claims that he has now on use, and asserted

9  that trans fats -- PHOs -- are not Generally Recognized as Safe

10  in the scientific community, and had a jury determine whether

11  or not that's the case?

12         **MR. GIALI:**  He can.

13         **MR. WESTON:**  I have.

14         **MR. GIALI:**  He can.  And he lost that argument,

15  Your Honor, against my client, California Pizza Kitchen.

16         **THE COURT:**  Well, that's interesting, because at

17  whatever time that case was litigated, I assume everybody put

18  in --

19    Did it actually go to a jury, or was it decided before

20  trial?

21         **MR. GIALI:**  No.  The Judge dismissed that at the

22  pleadings stage.  Mr. Weston never amended.

23         **THE COURT:**  Oh, well, I'm not asking whether --

24    Anybody could file anything, obviously; but whether it's a

25  viable lawsuit.

1      MR. GIALI:  Well, the *Simpson* Decision says it is not

2  a viable lawsuit.

3      THE COURT:  Because?

4      MR. GIALI:  Because FDA is responsible for these

5  decisions.  And partially hydrogenated oil is a lawful

6  ingredient in food in the United States.  And Mr. Weston, under

7  state law, cannot disrupt that.

8      THE COURT:  At that time.

9      MR. GIALI:  At that time.

10      THE COURT:  Okay.

11      MR. GIALI:  I think my case is only stronger now,

12  because --

13      THE COURT:  No, no, your case isn't stronger now.

14      MR. GIALI:  The Final Determination --

15      THE COURT:  Your case was a lot better before that

16  Final Determination.

17      Okay.  We're not talking about that.

18      MR. GIALI:  Okay.

19      THE COURT:  Here's the point.  In fact, how can you

20  say your case is stronger, when a federal agency says the

21  substance your client puts in its food not Generally Recognized

22  as Safe?

23      MR. GIALI:  Because I have three years, Your Honor.

24  That's not ambiguous.

25      THE COURT:  To get them to change their --

1        **MR. GIALI:**  No, no.  Three years to use PHO.

2        **THE COURT:**  Well, okay.  That's a different argument

3  about whether one can say this is unlawful, given what the FDA

4  has said; but as Mr. Weston has argued, they're just not

5  enforcing it.  That doesn't mean it isn't unlawful.

6        So anyway, there are lots of arguments that everyone made.

7        The main point here is that I still don't know, then,

8  whether -- I'm asking for the law; not what somebody did and

9  got ruled on.  Is there an opportunity then, legally for --

10  before the FDA weighs in, and you have some company going, "I

11  think it's safe, as far as I'm concerned.  So does the general

12  scientific community."

13        Okay.  When you don't have the FDA weighing in, can

14  somebody sue and say, "There's no general consensus that it's

15  safe; and therefore, you can't sell it"?

16        **MR. WESTON:**  I can tell you I think there are

17  actually two categories rather than three.  And it depends on

18  whether or not something was in use before 1958.

19        If you come up with a new food additive after 1958, it is

20  definitively prohibited, unless it gets approval by the FDA

21  through the GRAS petition.

22        For pre-'58 items, like trans fat, the FDA can weigh in

23  definitively.  However, there is not a requirement that the FDA

24  weigh in to make it usable.  Now, you still risk just standard,

25  common-law liability of being sued on -- for instance, there's

1  no FDA-specific regulation that -- I don't know -- uranium is

2  unsafe for food.  That doesn't mean the fact that uranium's not

3  on the not GRAS list, it can be used in food without liability.

4  So before 1958, there's not an automatic prohibition.  It is a

5  matter of manufacturers --

6       **THE COURT:**  I understand that.  Never mind.  Forget I

7  asked the question.  Neither one of you has answered it.

8       **MR. GIALI:**  I think I do have the answer, because I

9  think I now understand your question.  That lawsuit needs to be

10  brought before the FDA.  I think your case would be thrown out

11  of court, and you'd be told to go to the FDA to challenge

12  whether an ingredient would be safe.

13       **THE COURT:**  You start at the administrative level.

14       **MR. GIALI:**  And Mr. Weston did that in PHOs.

15  Remember?  He told us before today that he brought his lawsuit

16  to the FDA about PHOs.

17       **THE COURT:**  Okay.  All right.  Okay.  You do

18  understand the question.  Thank you.

19       All right.  Yeah, that makes some sense, because in

20  looking at the cases in which determinations as to GRAS were

21  made, none of them were in the context of a private lawsuit

22  just essentially suing the company.  They were challenges to

23  FDA rulings.  There were FDA determinations that they were

24  trying to enforce in one way or the other.  Okay.  That make

25  some sense.

1    Well, as you can see, lots to talk about.  And I may

2  change my views about all kinds of things, now that we've had

3  the hearing; but you're not going to hear from me in a couple

4  of minutes.  Let me put it that way.

5    So I'm taking the matter under submission.  I'll let some

6  of this discussion percolate, and go back and look at some of

7  the authority again.

8    As I say, there are many, many issues.  I'm not going to

9  spend the amount of time that one could actually spend on this

10 question of physical injury and risk of harm.  I don't think

11 the plaintiff needs that for standing.  He doesn't feel he

12 needs it.  There's no claim for damages resulting, so there's

13 no need to kill that off for some reason.  And I will consider

14 standing based on the economic claim that's being made.  And

15 also I will deal with the motion to strike.

16    I'll just tell you:  Some stuff's going; some stuff's

17 staying.  Okay?  All right.  So that concludes our hearing.

18        **MR. WESTON:**  Thank you, Your Honor.

19        **MR. GIALI:**  Thank you very much, Your Honor.

20        **THE COURT:**  I appreciate that you both are very

21 knowledgeable in the field.  It's a help.  Thank you.

22 (At 10:35 a.m. the proceedings were adjourned.)

23

24

25

1   I certify that the foregoing is a correct transcript from the

2   record of proceedings in the above-entitled matter.

3

4

5   _____   August 24, 2015

    Signature of Court Reporter/Transcriber   Date

6   Lydia Zinn

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25