1

2

3

4

5

6

7

8

IN THE UNITED STATES DISTRICT COURT

9

FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11

TROY BACKUS, on behalf of himself and all
others similarly situated,

No. C-15-1963 MMC

12

        Plaintiff,

**ORDER GRANTING DEFENDANT
NESTLÉ USA'S MOTION TO DISMISS
FIRST AMENDED COMPLAINT**

13

14

v.

15

NESTLÉ USA, INC.,

16

        Defendant.

                             /

17

18

      Before the Court is defendant Nestlé USA, Inc.'s ("Nestlé") Motion to Dismiss the

19

First Amended Complaint, filed July 17, 2015, pursuant to Rules 8, 9(b), 12(b)(1), and

20

12(b)(6) of the Federal Rules of Civil Procedure.  Plaintiff Troy Backus ("Backus") has filed

21

opposition, to which Nestlé has replied.  The matter came on regularly for hearing on

22

August 21, 2015, after which, with leave of Court, both parties have filed supplemental

23

briefing.  In addition, Nestlé has filed statements of recent authority, the last of which filings

24

was submitted on January 4, 2016, and thereafter, on February 17, 2016, opposed by

25

Backus.  Having considered the parties' respective written submissions and the arguments

of counsel at the hearing, the Court rules as follows.

26

**BACKGROUND**

27

      In the operative complaint, the First Amended Complaint ("FAC"), filed June 26,

28

2015, Backus alleges that Nestlé manufactures, markets, and sells Coffee-mate, a line of

*United States District Court*

*For the Northern District of California*

coffee-creamer products containing partially hydrogenated oil ("PHO"), an artificial form of trans fat.  (*See* FAC ¶¶ 4-6, 21).  Backus further alleges that PHO is an "illegal, dangerous additive" (*id.* ¶ 8) for which there is "'no safe level'" of consumption (*id.* ¶ 26), and he claims that Nestlé has acted unlawfully by: (1) using PHO in Coffee-mate despite the existence of safe alternatives to PHO (*see id.* ¶¶ 8-10); and (2) "falsely and misleadingly" marketing Coffee-mate products as having "0g Trans Fat" (*id.* ¶ 12), in particular by "prominently display[ing]" the aforementioned statement "on the front of each bottle" (*id.* ¶ 85).

In the FAC, Backus asserts nine causes of action, brought both individually and on behalf of two putative classes: (1) the "PHO Class," defined as "[a]ll persons who purchased in the United States, on or after January 1, 2006, Coffee-mate products containing partially hydrogenated oil"; and (2) the "0g Trans Fat Claim Subclass," defined as "[a]ll persons who purchased in the United States, on or after January 1, 2006, Coffee-mate containing the front labeling claim '0g Trans Fat' and containing partially hydrogenated oil."  (*Id.* ¶ 150.)

The first three causes of action pertain to the PHO class and challenge Nestlé's use of PHO in Coffee-mate products ("use claims").  The last six causes of action pertain to the 0g Trans Fat Claim Subclass and challenge the "0g Trans Fat" label ("labeling claims").[1]

The nine causes of action are predicated on, respectively: (1) the "Unfair Prong" of California's Unfair Competition Law ("UCL") (*id.* ¶¶ 159-165); (2) the "Unlawful Prong" of the UCL (*id.* ¶¶ 166-176); (3) breach of the "Implied Warranty of Merchantability" (*id.* ¶¶ 177-183); (4) the "Unlawful Prong" of the UCL (*id.* ¶¶ 184-196); (5) the "Fraudulent Prong" of the UCL (*id.* ¶¶ 197-202); (6) the "Unfair Prong" of the UCL (*id.* ¶¶ 203-210); (7) California's "False Advertising Law" (*id.* ¶¶ 211-214); (8) California's "Consumer Legal Remedies Act" (*id.* ¶¶ 215-218); and (9) breach of "Express Warranty" (*id.* ¶¶ 219-225).

By the instant motion, Nestlé seeks an order dismissing the FAC in its entirety.

---

[1]Although such differentiation is not clear from the FAC, Backus confirmed at the August 21, 2015, hearing that the first three causes of action pertain to the use of PHO and that the last six pertain to labeling.  (*See* Tr. of Proceedings for Aug. 21, 2015, at 3:4-4:3.)

2

**LEGAL STANDARD**

Dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure "can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory."  *See Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).  Because Rule 8(a)(2) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,'" *see Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting Fed. R. Civ. P. 8(a)(2)), "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," *see id.*  Nonetheless, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

In ruling on a Rule 12(b)(6) motion, the district court must accept as true all material factual allegations in the complaint and construe them in the light most favorable to the nonmoving party.  *See NL Indus., Inc. v. Kaplan*, 792 F.2d 896, 898 (9th Cir. 1986).  With limited exception, however, a district court may not consider any material beyond the complaint.  *See Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990).

**DISCUSSION**

At the outset, Nestlé argues that all of Backus's causes of action are preempted by the federal Food, Drug, and Cosmetic Act ("FDCA").

Under the Supremacy Clause of the United States Constitution, federal law preempts state law when "(1) Congress enacts a statute that explicitly pre-empts state law; (2) state law actually conflicts with federal law; or (3) federal law occupies a legislative field to such an extent that it is reasonable to conclude that Congress left no room for state regulation in that field."  *Chae v. SLM Corp.*, 593 F.3d 936, 941 (9th Cir. 2010).

The party who asserts a state law is preempted bears the burden of demonstrating such preemption, *see Stengel v. Medtronic, Inc.*, 704 F.3d 1224, 1227 (9th Cir. 2013), as well as overcoming a "starting presumption that Congress does not intend to supplant state

law" in a field, such as that at issue here, that has been "traditionally occupied by the States," *see De Buono v. NYSA-ILA Med. & Clinical Servs. Fund*, 520 U.S. 806, 814 (1997) (internal quotations and citations omitted); *see also Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485 (1996) (acknowledging states' historic "regulation of matters of health and safety").

**A.  Use Claims: First through Third Causes of Action**

Nestlé contends Backus's use claims, all of which arise under state law, are barred by the doctrine of conflict preemption.

Conflict preemption applies where "compliance with both federal and state regulations is a physical impossibility" or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *see Ting v. AT&T*, 319 F.3d 1126, 1136 (9th Cir. 2003) (internal quotations and citations omitted); *see also Geier v. American Honda Motor Co., Inc.*, 529 U.S. 861, 873-75 (2000) (holding conflict preemption applies to lawsuits that "prevent or frustrate the accomplishment of a federal objective"; finding "common-law 'no airbag'" claim preempted where, based on various objectives, Department of Transportation ("DOT") regulation provided vehicle manufacturers with range of choices among different passive restraint devices). Accordingly, the Court next turns to the federal law here at issue.

Pursuant to the FDCA, "[t]he introduction or delivery for introduction into interstate commerce of any food . . . that is adulterated" is "prohibited."  21 U.S.C. § 331(a).  A food is deemed to be adulterated "if it is or if it bears or contains . . . any food additive that is unsafe within the meaning of" 21 U.S.C. § 348.  *Id.* § 342(a)(2)(C)(i).  A food additive, in turn, is "any substance the intended use of which results . . . in its becoming a component or otherwise affecting the characteristics of any food . . . if such substance is not generally recognized, among experts qualified . . . to evaluate its safety, . . . to be safe under the conditions of its intended use."  *Id.* § 321(s).  A food additive is deemed "unsafe" unless, for purposes relevant here, it complies with "a regulation issued under [§ 348] prescribing the conditions under which such additive may be safely used."  *Id.* § 348(a)(2).  Any person may file with the Food and Drug Administration ("FDA") a "petition proposing the issuance

4

1   of [such] a regulation." *Id.* § 348(b)(1).

2       On June 17, 2015, the FDA published a final determination and declaratory order,

3   finding "there is no longer a consensus among qualified experts" that PHOs "are generally

4   recognized as safe (GRAS) for any use in human food," *see* Final Determination Regarding

5   Partially Hydrogenated Oils (hereinafter, "Final Determination"), 80 Fed. Reg. 34650-01,

6   34650 (June 17, 2015), and, as a result, "are food additives subject to section 409" of the

7   FDCA (21 U.S.C. § 348), *id.* By said order, the FDA "require[d] discontinuation of the use

8   of these additives," *id.* at 34656, "encourage[d] submission of scientific evidence as part of

9   food additive petitions under section 409" for "one or more specific uses of PHOs," *id.* at

10  35653, and set a "compliance date" of June 18, 2018, "to allow time for such petitions and

11  their review," *id.*[2]

12      The FDA also identified therein a number of other considerations and found a three-

13  year compliance period would have "the additional benefit" of: (1) providing small

14  businesses with time to address "difficulties . . . due to limited research and development

15  resources and potential challenges to gain timely access to suitable alternatives"; (2)

16  "minimizing market disruptions by providing industry sufficient time to identify suitable

17  replacement ingredients for PHOs, to exhaust existing product inventories, and to

18  reformulate and modify labeling of affected products"; and (3) providing time "for the

19  growing, harvesting, and processing of new varieties of edible oilseeds to meet the

20  expected demands for alternative oil products and to address the supply chain issues

21  associated with transition to new oils." *Id.* at 34668-69.

22      Thereafter, on December 18, 2015, the President signed into law the Consolidated

23  Appropriations Act for 2016 (H.R. 2029), which includes the following section pertaining to

24  PHOs:

25      SEC. 754: No partially hydrogenated oils as defined in the order published by

26  ───────────────

27      [2]The FDA's order was issued "to remove uncertainty as to the status of PHOs as
    food additives" and "has the force and effect of law." *See* Final Determination at 34656-57;
28  5 U.S.C. § 554(e) (providing agency "may issue a declaratory order to terminate a
    controversy or remove uncertainty").

1
2
3
4

the Food and Drug Administration in the Federal Register on June 17, 2015 (80 Fed. Reg. 34650 et seq. [Final Determination]) shall be deemed unsafe within the meaning of section 409(a) [21 U.S.C. § 348(a)] and no food that is introduced or delivered for introduction into interstate commerce that bears or contains a partially hydrogenated oil shall be deemed adulterated under sections 402(a)(1) [21 U.S.C. § 342(a)(1)] or 402(a)(2)(C)(i) [21 U.S.C. § 342(a)(2)(C)(i)] by virtue of bearing or containing a partially hydrogenated oil until the compliance date as specified in such order (June 18, 2018).

5
6

Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, § 754, 129 Stat. 2242, 2284

(2015) ("CAA § 754").

7
8
9
10
11
12

Nestlé argues that Backus's suit, which "seeks to make it *immediately unlawful* to

market or sell" in California any food product containing PHOs, conflicts with the FDA's

regulatory scheme for PHOs, which, as discussed above, allows producers to use PHOs

until June 18, 2018.  (Mot. at 6 (emphasis in original).)  The Court, as discussed below,

agrees.

13
14
15
16
17
18
19

Where, as here, both the FDA and Congress have spoken, the case for conflict

preemption takes on added strength.  Backus's use claims, which challenge, as a violation

of California statutory and common law, Nestlé's past and current inclusion of PHOs in

Coffee-mate, would effectively negate the FDA's order setting a compliance date in 2018

and "stand[ ] as an obstacle to the accomplishment and execution of the full purposes and

objectives" of the FDA in adopting that order.  *See Ting*, 319 F.3d at 1136.  Backus's

arguments to the contrary are not persuasive.

20
21
22
23
24
25
26

First, Backus's characterization of the FDA's findings is not accurate.  The FDA did

not find PHOs "unsafe in any circumstance" or "never safe" (Opp'n at 12, 14); it found

"there is no longer a consensus among qualified experts" as to whether they are safe.

Final Determination at 34650.  Indeed, in discussing the comments it received as to

appropriate "threshold" levels of PHOs, the FDA made clear it "need not determine that

there is a consensus that low level uses are unsafe to find that PHOs are not GRAS at low

levels." *Id.* at 34653.

27
28

Consistent therewith, the FDA chose a compliance date that, in its judgment, best

serves the interests of both the industry and consumers.  In that regard, the FDA

1  considered comments recommending compliance dates "ranging from immediate to over

2  10 years." *Id.* at 34668.  As the FDA explained, it chose a period of three years in order to

3  allow sufficient time for it to receive and review "scientific evidence," *id.* at 34653, as to "one

4  or more specific uses of PHOs for which . . . safe conditions of use may be prescribed," *id.*

5  Backus's use claims would present an insurmountable obstacle to the accomplishment of

6  such objective.

7        Further, as set forth above, the FDA, in an effort to "minimiz[e] market disruptions,"

8  *id.* at 34669, weighed a number of additional factors, including the ability of businesses to

9  "gain timely access to suitable alternatives," *id.*, and to grow and process new varieties of

10  edible oilseeds to meet "expected demands," *id.*  A finding of liability on any of Backus's

11  use claims would present obstacles to the accomplishment of these additional objectives as

12  well.  *See, e.g., Geier*, 529 U.S. at 874-75 (finding "no airbag" lawsuit preempted where

13  federal regulation allowed choice of passive restraints; rejecting argument by plaintiff that

14  DOT set "minimum airbag standard" and, "as far as [the regulation] is concerned, the more

15  airbags, and the sooner, the better").

16        Next, Backus's reliance on the FDA's statement that it "believes . . . that state or

17  local laws that prohibit or limit use of PHOs in food are not likely to be in conflict with

18  federal law, or to frustrate federal objectives," *see* Final Determination at 34655, is

19  unavailing.  The statement is not a finding, only a comment, and an ambiguous one at best,

20  as there is no indication what state laws the FDA had in mind, let alone any reasons for the

21  FDA's "belief."  *See Wyeth v. Levine*, 555 U.S. 555, 577 (2009) (holding, even where

22  agency provides explanation for its view of state law's impact on federal scheme, weight to

23  be accorded such explanation "depends on its thoroughness, consistency, and

24  persuasiveness").  Indeed, in the sentence immediately preceding its "belief," the FDA

25  "decline[d] to take a position regarding the potential for implied preemptive effect of [its]

26  order on any specific state or local law" and acknowledged "such matters must be analyzed

27  with respect to the specific relationship between the state or local law and the federal law."

28  Final Determination at 34655.

1   Tellingly, nothing in the order suggests the FDA meant to reference general, broadly

2   applicable state laws, such as those on which Backus's use claims are predicated, as

3   opposed to statutory provisions specifically applicable to PHOs.  Moreover, Backus points

4   to no state statute, either in effect at the time the FDA issued its declaratory order or

5   otherwise, by which all use of PHOs is expressly proscribed; rather, the statutes to which

6   Backus cites proscribe the use of PHOs only in certain limited circumstances.  (*See* FAC at

7   6 n.15 (citing Cal. Educ. Code § 49431.7, Cal. Health & Safety Code § 114377); *see also*

8   Cal. Educ. Code § 49431.7 (proscribing schools' and school districts' sale of foods

9   containing artificial trans fats to elementary and high school pupils during school hours

10  "unless the manufacturer's documentation or the label required on the food, pursuant to

11  applicable federal and state law, lists the trans fat content as less than 0.5 grams"); Cal.

12  Health & Safety Code § 114377 (providing "no oil, shortening, or margarine containing

13  artificial trans fat for use in spreads or frying . . . may be . . . served by, or used in the

14  preparation of any food within, a food facility").)

15      Lastly, Backus's argument that the FDA lacks the authority to issue an order making

16  legal a usage that, under the above-described statutory scheme, is not allowed, has been

17  addressed and the question mooted by the enactment of CAA § 754, by which Congress

18  essentially ratified the FDA's Final Determination.  *See* CAA § 754 (providing PHOs shall

19  not be "deemed unsafe within the meaning of section 409(a) [21 U.S.C. § 348(a)]"; further

20  providing foods containing PHOs shall not be "deemed adulterated under sections

21  402(a)(1) [21 U.S.C. § 342(a)(1)] or 402(a)(2)(C)(i) [21 U.S.C. § 342(a)(2)C)(i)]" by reason

22  of any such inclusion prior to June 18, 2018).

23      In sum, the Court finds Backus's use claims, which would impose an immediate

24  prohibition on the use of PHOs in all foods under all circumstances, would "stand[ ] as an

25  obstacle" to the fulfillment of the FDA's objectives, as embodied in its regulatory scheme

26  setting a three-year compliance period, and conflict with Congress's decision not to deem

27  PHOs unsafe, or the food containing them adulterated, pending the June 18, 2018,

28  compliance date set by the FDA in its Final Determination of June 17, 2015.  *See Ting*, 319

1    F.3d at 1136.

2         Accordingly, the First, Second, and Third Causes of Action will be dismissed as

3    preempted.[3]

4    **B. Labeling Claims: Fourth through Ninth Causes of Action**

5         Nestlé contends Backus's labeling claims, all of which arise under state law, are

6    expressly preempted.

7         Express preemption applies "when a statute explicitly addresses preemption." *Reid*

8    *v. Johnson & Johnson*, 780 F.3d 952, 959 (9th Cir. 2015).  As relevant to the claims here at

9    issue, the express preemption analysis "turns on whether the challenged statements are

10   authorized by the FDA's regulations or other pronouncements of similar legal effect." *Id.*

11   Accordingly, the Court again turns to the relevant federal law.

12        The FDCA, as amended by the Nutrition Labeling and Education Act ("NLEA"),

13   governs the labeling of food.  *See Lilly v. ConAgra Foods, Inc.*, 743 F.3d 662, 664 (9th Cir.

14   2014).  Nestlé argues Backus's labeling claims are expressly preempted under the NLEA,

15   which establishes "uniform food labeling requirements." *Id.*  In particular, Nestlé argues,

16   Backus's labeling claims are preempted under 21 U.S.C. § 343-1, which, in relevant part,

17   provides:

18       [N]o State or political subdivision of a State may directly or indirectly establish
         under any authority or continue in effect as to any food in interstate
19       commerce . . .

20       any requirement for nutrition labeling of food that is *not identical to* the
         requirement of section 343(q) of this title . . . or . . .
21

22       any requirement respecting any claim of the type described in section
         343(r)(1) of this title, made in the label or labeling of food that is *not identical*
23       *to* the requirement of section 343(r) of this title . . . .

24   *See* 21 U.S.C. § 343-1(a)(4)-(5) (emphasis added).

25        Sections 343(q) and 343(r), in turn, set forth the specific labeling requirements that

26   govern, respectively, claims made in the "Nutrition Facts" box of the product's packaging

27   ────────────────

28       [3]In light of such ruling, the Court does not address herein Nestlé's additional
     arguments in support of dismissal of the first three causes of action.

1   (hereinafter, "nutrition box") and claims made elsewhere on the packaging.  Of particular

2   relevance here are the regulations the FDA has promulgated in implementing those

3   provisions.

4          As noted, Backus challenges Nestlé's "0g Trans Fat" claim, made "on the front of

5   each bottle" of Coffee-mate (*see* FAC ¶ 85), i.e., outside the nutrition box.  Because the

6   claim appears outside the nutrition box, the claim is classified under the regulations as a

7   "nutrient content claim," *see* 21 C.F.R. § 101.13(c), and, more specifically, an "expressed

8   nutrient content claim," *see id.* § 101.13(b)(1).  Such a nutrient content claim is not

9   precluded, provided it is "not false or misleading in any respect."  *Id.* § 101.13(i)(3).  Nestlé

10  argues the nutrient content claim here at issue is not misleading and, indeed, is required by

11  the applicable federal regulations, given the FDA's requirements for statements made

12  inside the nutrition box.

13         For claims made inside the nutrition box, the regulations require a "statement of the

14  number of grams of trans fat in a serving," unless the product "contain[s] less than 0.5 gram

15  of total fat in a serving" and "no claims are made [outside the nutrition box] about fat, fatty

16  acid or cholesterol content."  *See id.* § 101.9(c)(2)(ii).  The regulations further provide that

17  "[i]f the serving contains less than 0.5 gram [of trans fat], the content, when declared, shall

18  be expressed as zero."  *Id.*[4]  For purposes of the instant motion, it is undisputed that the

19  Coffee-mate products here at issue contain less than 0.5 gram of trans fat and,

20  consequently, that Nestlé, in the nutrition box, is required to express the trans fat content

21  as zero grams.  The issue thus presented is whether the same claim made outside the

22  nutrition box likewise is required, or at least authorized.  *See Reid*, 780 F.3d at 959 (holding

23  express preemption analysis "turns on whether the challenged statements are authorized

24  by the FDA's regulations").  If so, Backus's labeling claims are preempted.

25         To date, the Ninth Circuit, albeit in an unpublished decision, as well as three district

26

27         [4] "[I]f a statement of the trans fat content is not required, . . . the statement 'Not a
28  significant source of trans fat' shall be placed at the bottom of the table of nutrient values."
    *Id.*

courts in this district, have found labeling claims that are essentially indistinguishable from the labeling claims here at issue were preempted by the NLEA. *See Carrea v. Dreyer's Grand Ice Cream, Inc.*, 475 Fed. App'x 113, 115 (9th Cir. 2012); *Walker v. B&G Foods, Inc.*, 2016 WL 463253, at *3-4 (N.D. Cal. Feb. 8, 2016); *Guttmann v. Nissin Foods (U.S.A.) Co., Inc.*, 2015 WL 4309427, at *3 (N.D. Cal. July 15, 2015); *Chacanaca v. Quaker Oats Co.*, 752 F. Supp. 2d 1111, 1121 (N.D. Cal. Oct. 14, 2010).[5]

Although the analyses provided by those four courts differ somewhat, each found significant the FDA's expressed "preference for internal consistency between the nutrition box and the rest of the label." *See Chacanaca*, 752 F. Supp. 2d at 1121 (citing 58 Fed. Reg. 44020-01, 44024 (Aug. 18, 1993));[6] 58 Fed. Reg. at 44024 (finding "because there is no nutritional difference between rounded and unrounded values of a nutrient in a food, the agency does not see a need to specify which value should be used in determining whether or not a food qualifies to make a nutrient content claim"; further finding, with respect to relative claims,[7] "it is more important to prevent consumer confusion by having consistency on the food label than to be prescriptive as to the method by which nutrient values . . . are determined and used"); *see also, e.g.*, *Carrea*, 475 Fed. App'x at 115 (holding "0g Trans Fat" statement on front of packaging is express nutrient content claim that FDA "instructs should mirror the Nutrition Facts panel").

Further, as noted by a district court in the Central District, additional support for preemption can be found in 21 U.S.C. § 343(r)(2)(A)(i), which provides that, with limited

---

[5] A number of other district courts likewise have found such claims preempted. *See Henderson v. Gruma Corp.*, 2011 WL 1362188, at *13 (C.D. Cal. Apr. 11, 2011) (finding state law claims based on "0 g transfat" preempted); *Peviani v. Hostess Brands, Inc.*, 750 F. Supp. 2d 1111, 1119-20 (C.D. Cal. 2010) (finding state law claims based on "0 Grams of Trans Fat" preempted); *Red v. Kroger Co.*, 2010 WL 4262037, at *1, 5-6 (C.D. Cal. Sept. 2, 2010) (finding state law claims based on "0g Trans Fat per serving" preempted).

[6] To the extent Nestlé contends, however, that an express nutrient content claim can never be misleading if it simply restates the information in the nutrition box, this Court, as did the district court in *Chacanaca*, disagrees. *See Chacanaca*, 752 F. Supp. 2d at 1120 n.5.

[7] A "relative" claim is one in which the nutrient level of the labeled product is compared with that of another product. *See* 21 C.F.R. § 101.13(j).

exceptions not applicable here, a claim outside the nutrition box that characterizes the level of any covered nutrient may only be made "if the characterization of the level . . . uses terms which are defined in regulations of the Secretary."  *See* 21 U.S.C. § 343(r)(2)(A)(i); *Henderson*, 2011 WL 1362188, at *13 (noting, for trans fats, regulations provide that "[i]f the serving contains less than 0.5 gram, the content, when declared, shall be expressed as zero").

Backus argues that *Reid*, a published opinion decided after *Carrea*, requires a different result than that reached in the above-cited cases.  *See Reid*, 780 F.3d at 959-63. The Court disagrees.  Although *Reid*, as here, concerned a labeling claim made on the outside packaging of a product containing less than 0.5 gram of trans fat per serving, the statement there at issue was "No Trans Fat."  In finding challenges based thereon were not preempted, the Ninth Circuit gave deference to a warning letter in which the FDA "indicated that 'No Trans Fat' is 'an unauthorized nutrient content claim.'"  *See id.* at 956, 962; *see also id.* at 962-63 (noting FDA, in promulgating 21 C.F.R. § 101.62(b)-(c), approved "No Fat" and "No Saturated Fat" for use as nutrient content claims but decided not to allow "No Trans Fat" claim).

The nutrient content claim at issue in *Reid* is distinguishable.  In the context of the FDA's regulations, the word "No" has no meaning beyond its ordinary, dictionary definition, i.e., "not any," and "No" cannot be used to list trans fat content in the nutrition box.  In contrast, "0g Trans Fat" is explicitly defined as any quantity less than 0.5 gram, and, as discussed above, is a rounded value whose use in the nutrition box is mandated by the FDA.  Tellingly, with respect to "0g Trans Fat" nutrient content claims, Backus points to no FDA warning similar to that on which *Reid* relied, and the absence thereof further supports the analysis set forth in the above-cited decisions in which the courts have found state law causes of action based thereon preempted.

In sum, the Court finds the nutrient content claim challenged here by Backus is authorized by the above-discussed regulations and, as such, is neither false nor misleading under federal law.  Consequently, the relief Backus seeks by his labeling claims would

1   impose a requirement that is not identical to the requirements imposed by those

2   regulations, and thus each of his labeling claims is preempted.[8]

3       Accordingly, the Fourth through Ninth Causes of Action will be dismissed as

4   preempted.[9]

5   **C.  Leave to Amend**

6       In his opposition, Backus requests leave to amend in the event that the Court

7   dismisses any of his claims.  Although, as Backus points out, leave to amend should be

8   granted with liberality, such leave is not required where amendment would be futile.  *See*,

9   *e.g., Carrico v. City and County of San Francisco*, 656 F.3d 1002, 1008 (9th Cir. 2011).

10  Here, given the grounds on which the Court has determined Backus's claims are subject to

11  dismissal, the Court finds the requested leave would be unavailing as a matter of law.

12                          **CONCLUSION**

13      For the reasons set forth above, Nestlé's motion to dismiss is hereby GRANTED,

14  and the FAC is hereby DISMISSED without further leave to amend.

15      **IT IS SO ORDERED.**

16

17  Dated: March 8, 2016

18                          MAXINE M. CHESNEY
                            United States District Judge

19

20

21

22

---

23      [8] The Court finds unpersuasive Backus's argument that his labeling claims

24  nonetheless survive under 21 U.S.C. § 343(a), a general provision that precludes labeling
    that is "false or misleading in any particular" and is not referenced in the express
    preemption provisions of § 343-1.  *See, e.g., Gorenstein v. Ocean Spray Cranberries, Inc.*,

25  2010 WL 10838229, at *1 (C.D. Cal. Jan. 29, 2010) (finding § 343(a) "is but a part of a
    larger statutory scheme that must be construed, to the extent possible, to give effect to all

26  of its provisions"; noting "the Supreme Court has warned against . . . literalism where it
    effectively defeats the statutory objective by negating other statutory provisions").

27

28      [9] In light of such ruling, the Court does not address herein Nestlé's additional
    arguments in support of dismissal of the Fourth through Ninth Causes of Action.